ZU

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

FILED

JAN 19 2016 EAA
1-19-16
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

VICENTE GARCIA,
Movant,
VS.

UNITED STATES OF AMERICA,
Respondent,

16-cv-0859
Judge Charles Norgle
Magistrate Judge Maria Valdez

MEMORANDUM OF LAW IN SUPPORT OF MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE

Comes now, Vincent Garcia, hereinafter "Movant, proceeding pro-se and hereby submitts this memorandum of law in support of a motion under 28 U.S.C. § 2255 to vacate, set aside, or correct a sentence in violation of the laws and constitution of the United States. In support thereof it is stated:

PRELIMINARY NOTES

As a pro-se litigant, movant respectfully requests this court liberally construe his pleadings when it is necessary to grant relief. See Haines v. Kerner, 404 U.S. 519 (1972). See also Pabon v. Wright, 459 F.3d 241, 248 (2nd Cir 2006) (since the instant application is submitted pro-se, movant implores the court for patience with his errors and that said pleadings be liberally construe to raise the strongest argument they suggest).

Due to this Court's familiarity with the case, movant does not seek to burden the court by recounting the relevant facts and background sufficiently established within the record. Facts that require expansion of the record are incorporated into the arguments as appropriate.

ARGUMENT(S)

1). MOVANT APRISONER IN CUSTODY HAS THE RIGHT TO BE RELEASED UPON THE GROUNDS THAT THE SENTENCE WAS IMPOSED IN THE COMPLETE ABSENCE OF SUBJECT MATTER JURISDICTION PURSUANT TO ARTICLE III SUBSECTION 2 CLAUSE OF THE UNITED STATES CONSTITUTION. CONSEQUENTLY VIOLATING HIS FIFTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS

The United States Constitution expresses that the Federal Courts Judicial powers are restricted to "cases" and "controversies". (See U.S. Constitution Article III Subsection 2 Clause 1)

The United States Supreme Court has established in a long line of venerable cases, that in order to invoke the Federal Courts Jurisdiction the plaintiff must establish Standing, which consist of 3 elements,"injury in fact", causation, and redressability. See Lujan v. Defenders of wildlife, 504 U.S. 555; Allen v Wright 468 U.S.737; Steel Co. v Citizens for a better env. 523 U.S. 83.

I Vicente Garcia assert under the penalty of perjury, that the plaintiff, UNITED STATES OF AMERICA in Case No. 08-CR-746 failed to present the District Court with a "case" or "controversy" by establishing standing in the incipient complaint. See Docket Sheet first entry. Consequently, failing to invoke the District Courts power pursuant to Article III Subsection 2 Clause 1 of the United States Constitution. In addition , because the plaintiff, UNITED STATES OF AMERICA in the aforementioned case No. Failed to present a "case" or "controversy" by establishing standing to sue and invoking its power pursuant to Article III, the Court assumed Jurisdiction to decide the merits of the case. "Hypothetical Jurisdiction, which the Supreme Court declined to endorse because it

carried the Courts beyond the bounds of authorized judicial action.

Because the Court lacked Subject Matter Jurisdiction, it acted outside of the Authorized Judicial Action, therefore the aforementioned Case No. should by Supreme Court precedent be void ab initio.

2). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO CHALLENGE SUFFICIENCY OF RICO INDICTMENT.

The indictment in this case fails to set forth the pattern of racketeering activity through which the defendants conducted and participated in the conduct of the affairs of the enterprise. The indictment fails to give adequate notice of the predicate acts. The inadequate notice deprived movant the ability to investigate the charges against him and prepare a defense. The ill-defined racketeering activity left the prosecutor free to roam at large to shift its theory of criminality.

In addition, the Hobbs Act Count Ten also fails to give adequate notice. It fails to allege an overt act and it fails to state the names of individuals allegedly extorted. The inadequate notice deprived movant of the ability to investigate the charges against him and prepare a defense. For instance, movant was denied the opportunity to defend against any overt act and to subpeona the alleged victims of extortion for confrontational clause purposes. The ill-defined charges of extortion left the prosecutor free to roam at large to shift its theory of criminality.

Finally, the indictment failed to allege facts which constitutes a prosecutable Hobbs Act violation, muchless, a R.I.C.O. violation.

Purpose of presentation clause of the Fifth Amendment is two-fold; It entitles defendant to be in jeopardy only for offenses charged by a group of his fellow citizens acting independent of either prosecutor or judge; and it entitles defendant to be app-

rised of charges against him so that he knows what he must meet at trial. See U.S. v. Field, 875 F.2d 130 (7th Cir 1989).

Accordingly, trial counsel was ineffective for failing to challenge the R.I.C.O. indictment.

3). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO MOVE FOR SEVERANCE OF COUNTS TWELVE AND THIRTEEN CRACK COCAINE DISTRIBUTION.

The evidence shows that the count 12 and 13 pertains to drug sales of crack cocaine that took place on July 19, 2007 long before the commencement of the fabricated drug conspiracy count 11. These alleged sales are not part of the same series of acts or transactions. Therefore, they should have been severed as a matter of law. See U.S. v. Velasquez, 772 F.2d 1348, 1352 (7th Cir 1985).

Movant has suffered a grave injustice due to the prejudice caused by counsel's ineffectiveness when counsel failed to move for severance of counts and defendants.

Movant urges this court that an evidentiary hearing is necessary in this instant.

4). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL WITHDRAWS MOTION TO SUPPRESS WEAPONS AND FAILS TO OBJECT TO THE ADMISSION OF FIREARMS.

Trial counsel deprived movant of a fair trial when he withdrew motion to suppress weapons pre-trial (R. Vol. 1 at pg. 5) and fails to object to the admission of firearms at trial.

The firearms were the fruits of the forbidden tree and they should have been suppressed in violation of the fourth amendment warrant requirements.

In the event that the seizure of the firearms passed constitutional muster, then, counsel should have objected to the admission of such firearms because they are inadmissible uncharged crimes pursuant to 404(b) and 403 Fed.R.Evid. and they were highly prejudicial.

This error was not harmless because the prosecution relied heavily on the display of arms that permeated the whole trial.

Movant has suffered a grave injustice due to the prejudice caused by counsel's ineffectiveness when counsel failed to challege the seizure and failure to object to admission of firearms at trial.

Movant urges this court that an evidentiary hearing is necessary in this matter.

5). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL AND APPELLATE COUNSEL FAILED TO PROPERLY BRIEF AND/OR ARGUE THE ISSUE OF LAY TESTIMONY ON INTERPRETATION OF PHONE CONVERSATIONS.

In this case both informant witnesses Guajardo and Shanna testified as lay witnesses to interpreting simple phone conversations. See (Tr. Vol. 2 at 926 Guajardo Testimony, and Vol. 11 pg. 1267, Vol 12 Tr. 1779 Shanna Testimony).

Trial counsel objected to lay testimony at trial. See (Tr. Vol. 13 at Pgs 1906-1907). therefore, it was preserved for appellate review.

When lay witnesses testify, the opposing party can object for a number of reasons, including the witness'e lack of personal knowledge, or that the opinion testimony of lay witnesses is not "helpful to the determination of a fact in issue". Fed.R.Evid. 701(b); U.S. v. Grinage, 390 F.3d 746 (2nd Cir 2004); U.S. v. Dulcio, 441 F.3d 1269, 1275 (11th Cir 2006); U.S. V. Estrada, 39 F.3d 772 (7th Cir. 1994).

Guajardo and Shanna's testimony as lay witness violated Federal Rule of Evidence 701's mandate that lay witnesses may not testify based on "scientific, technical, or other specialized knowledge...". See Fed.R.Evid. Adv. Comm. Notes (2000) (Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 [for expert witnesses] will be evaded through the simple expedient of proffering an expert in lay witness's clothing).

Bacause the lay witness testimony constituted inadmissible evidence this error is not harmless due to the fact that the prosecurion relied heavily on such interpretations in its closing arguments.

Movant has suffered a grave injustice due to the prejudice caused by counsel's ineffectiveness when trial and appellate counsel failed to properly brief and/or argue the issue of lay testimony for appellate review.

Movant urges that an evidentiary hearing is necessary in this instant.

6). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO ARGUE AND INSTRUCT THE JURY THAT NEITHER AN AGREEMENT WITH A GOVERNMENT INFORMANT, NOR A BUYER SELLER RELATIONSHIP, IS LEGALLY SUFFICIENT TO AMOUNT TO A CONSPIRACY.

In this case the conspiracy was fabricated by both informant Guajardo and Shanna and evidence shows mere buyer seller relationship at the most on various isolated occasions. See (Counts 12, 13, 14, 15, 29, 32, 39, 41, 48). In addition, the evidence shows mere possession of drugs. See (Counts 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 30, 31, 33, 34, 35, 36, 37, 38, 40, 42, 43, 44,

45, 46, 47).

Conspiracy is an inchoate offense, in which an agreement to commit an unlawful act is the essential element of the crime, and serves to distinguish conspiracy from aiding and abetting which, although often based on agreement, does not require proof of that fact, and from other substantive offenses as well. See Iannelli v. U.S., 420 U.S. 770, 777 (1975).

It is axiomatic that a conspiracy conviction may not rest on an 'agreement' with a government informer. As it takes two to conspire, there can be no indictable conspiracy with a government informer who secretly intends to frustrate the conspiracy. U.S. v. Corson, 579 F.3d 804, 811 (7th Cir 2009)(An agreement must exist among coconspirators, that is, those who actually intend to carry out the agreed upon criminal plan. A defendant is not liable for conspiring solely with an undercover agent or a government informant). Thus, any agreement that movant had with government informants Guajardo and Shanna cannot support a conspiracy conviction. Furthermore, this circuit has held that a buyer seller relationship, without more, will not prove a conspiracy. See U.S. v. Colon, 549 F.3d 565, 569 (7th Cir 2008).

Evidence that movant was a regional Officer of the Latin Kings and was responsible for overseeing the membership of the Latin Kings does not necessarily establish that movant has joined the RICO, extortion, or drug conspiracy. Respondent Superior does not apply to movant. It is axiomatic that more is required than mere membership and/or knowledge of the purpose of the conspiracy.

The jury was not informed that neither an agreement with a

government informant nor a buyer seller relationship is sufficient basis to convict a defendant of conspiracy. Because there was no evidence that movant entered into any agreements to commit crimes against the United States or distribution of cocaine, the jury's finding that he was guilty of conspiracy can only have been based on the belief that it could convict movant based on agreements with government informants.

In this case trial counsel's failure to argue and instruct the jury that neither an agreement with government informants nor a buyer seller relationship is a sufficient basis to convict defendant of conspiracy cannot be attributed to trial strategy. This instruction was crucial to movant's defense and movant was entitled to such instruction. Accordingly, counsel's ineffectiveness denied movant a viable defense.

Movant urges this court that an evidentiary hearing is necessary in this instant.

7). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE APPELLATE COUNSEL FAILED TO CHALLENGE THE SUFFICIENCY OF EXTORTION COUNT.

In this case trial and appellate counsel were ineffective for failing to properly challenge the sufficiency of the evidence. For instance, (1) there is no proof that interstate commerce was affected in the alleged extortion of private individuals. See U.S. v Collins, 40 F.3d 95 (5th Cir 1999); (2) there is no proof that the assets of the miqueros were depleted by the extorted cash payments. The burden is on the government to prove this jurisdictional element lacking in this case.

Therefore, both trial and appellate counsel were ineffective

for failing to challenge the sufficiency of the evidence on the extortion predicate act.

Movant has suffered a grave injustice due to the prejudice caused by counsel's ineffectiveness in failing to challenge movant's actual innocence to a non-existing extortion offense.

Movant urges this court that an evidentiary hearing is necessary in this instant.

8). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO NOTE, OBJECT TO, OR ARGUE THE LACK OF CORROBORATING EVIDENCE OF THE EXTORTION COUNT.

In this case movant was prosecuted for extortion because it was alleged that as part of racketeering he conspired to commit extortion by demanding and receiving payments from an organization illegally selling fraudulant immigration documents. See (Count ten Superseding indictment).

There is no evidence of the extrotion on the organization illegally selling fraudulant immigration documents (The Miqueros) other than the cooperating witnesses uncorroborated admissions in court. The prosecution had the means and the burden to call (The Miqueros) to testify at court but it chose not to perhaps because their testimony would have been detremental to the government's case.

It is well settled that an accused party cannot be legally convicted on uncorroborated admission without some other proof of the corpus delecti.

The corpus delecti must be proved by evidence which a jury might reasonably accept as establishing the fact beyond a reasonable doubt. Movant contends that there is no evidence whatsoever

that an extortion was committed against (The Miqueros), other than the admissions of cooperating witnesses who were not charged or prosecuted for such admissions. Because there is no direct or circumstancial evidence corroborating the charge of extortion in Count Ten, movant's conviction for extortion violates corpus delecti rule.

Movant was prejudiced by trial counsel's failure to properly and timely raise the corpus delecti issue in the trial court. There is a reasonable probability that if the jury had been instructed on this claim, movant would not have been convicted of extortion and thus would not have been convicted of R.I.C.O. due to lack of two predicate acts required.

The old adage of where there is smoke there is fire is apt in this case. It is clear that the informants not only manufactured the R.I.C.O. scheme as well in an attempt to facbicate a RICO case against movant.

9). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO CORRECT FALSE TESTIMONY.

At trial confidential informant Caquias testified about extorting (The Miqueros). See Tr. at pg. 2547. Trial Counsel nor the prosecutor made no effort to correct such knowing false testimony.

It has been held that counsel's failure to correct incorrect testimony constitutes ineffective assistance of counsel. See Hanegan v. Miller, 663 F.3d 349 (8th Cir 2011).

A prosecutor also has a duty to correct knowing false testimony. See Napue v. Illinois, 360 U.S. 264, 269 (1959); U.S. v. Haese, 162 F.3d 359 (5th Cir 1998)(defendants conviction must be

on due process grounds where the government knowingly elicits, or fails to correct, materially false statements from his witnesses). See Also U.S. v. Silvers, 888 F. Supp 1289 (M.D. Md. 1995); U.S. v. Thomas, 987 F.2d 1298 (7th Cir 1993)(the government's knowing use of perjured testimony at trial violates due process when the perjury could deceive the jury into unjustly convicting a defendant).

Movant has suffered substantive prejudice by the presentation of knowing false testimony.

Appointed counsel and the prosecutor both owed movant the duty to correct knowing false testimony. Therefore, movant was denied his sixth amendment rights to effective assistance of counsel and not to be convicted on false testimony.

Movant urges this court that an evidentiary hearing is necessary in this instant.

10). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO INSTRUCT THE JURY ON CORPUS DELECTI RULE REGARDING EXTORTION CHARGES.

In this case counsel was ineffective for failing to instruct the jury that it could not find movant guilty on the basis of Ruben Caquias uncorroborated admissions.

Independent corroborating evidence is only required in cases where there is no clear proof of the corpus delecti, and here the corpus delecti or body of the crime is extortion of the miqueros.

The jury instruction is rooted in the principle enunciated in Opper and Smith, that a defendant's extrajudicial, post offense statements must be corroborated with independent evidence in order to assure reliability and truthfulness. See Opper v. U.S., 348 U.S. 84 (1954)(holding that post arrest admissions and confessions re-

quire corroboration of the essential facts admitted by a defendant), and Smith v. U.S., 348 U.S. 147 (1954) noting that the purpose of requiring corroboration of such statements is to prevent errors in convictions based upon untrue confessions alone).

It cannot be said that counsel's failure to request such an instruction was harmless error. because the jury was never advised that corroboration of Caquias' admissions was required, it may have improperly convicted on the basis of the uncorroborated admissions alone. See U.S. v. Adams, 583 F.3d 457, 470 (6th Cir 2009).

Movant has suffered a grave injustice due to the prejudice caused by counsel's ineffectiveness when counsel failed to instruct the jury on corpus delecti rule.

Movant urges this court that an evidentiary hearing is necessary in this instant.

11). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO RAISE A JURISDICTIONAL CHALLENGE TO MOVANT'S VICAR CHARGE.

In this case the VICAR acts occured long before Informant Shanna fabricated the interstate commerce affect into the conspiracy.

For Instance:

Count 2 occured on March 2, 2006

Count 9 occured on August 14, 2008

See (superseding Indictment).

The evidence shows that the activities of the alleged interprise did not have a substantial affect on interstate commerce. In fact there was only acts of violence.

In U.S. v. Garcia, 68 F.Supp.2d 802 (E.D. Mich 1999) the court held that for purposes of VICAR there is a requirement of a sub-

stantial effect on commerce. Therefore, trial and appellate counsel were ineffective for failing to challenge the VICAR counts on such jurisdictional basis.

Movant has suffered a grave injustice due to the prejudice caused by counsel's ineffectiveness when counsel failed to challenge the VICAR counts at trial and appeal on a jurisdictional basis.

Movant urges this court that an evidentiary hearing is necessary in this instant.

12). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO OBJECT TO IMPROPER CLOSING ARGUMENT.

In this case the prosecutor made several misstatements of law in its closing argument.

For instance:

(1) the prosecutor argued that the possession of firearm is activities that affect interstae commerce. )Tr. at 2785).

(2) the prosecutor argued that the miqueros were engaged in interstate commerce the extortion affected commerce. (Tr. at 2787)

These are two mistatements of facts because possession of a firearm is not activity that affects interstate commerce and the fact that the miqueros were engaged in interstate commerce the extortion does not per-se affect commerce.

A mistatement of law by a prosecutor can invalidate a conviction. See Whitehead v. Cowan, 263 F.3d 708 (7th Cir 2001). Accordingly, trial counsel was ineffective for failing to object to these clear mistatements of law.

With these two misstatements of law the phrases prosecutorial misconduct and fabrication jump out and grab you. The old adage of

where there is smoke there is fire is apt in this case. There is a serious question of whether the firearms seized and non-existing extortion was fabricated to manufacture (interstate commerce) and jurisdictional element in this case which is also the very basis of a due process violation.

To allow the prosecution to prove the jurisdictional commerce nexus with a simple possession of a firearm would open the door for future prosecutors employing the simple use of an automobile for proof of RICO jurisdiction.

Movant has suffered a grave injustice due to the prejudice caused by counsel's ineffectiveness in failing to object to the Mis-statements of law.

Movant urges this court that an evidentiary hearing is nece-ssary in this instant.

13). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO OBJECT TO THE GOVERNMENT"S HEY BATTA BATTA ARGUMENT IN CLOSING ARGUMENT.

At closing argument AUSA improperly attacked defense counsel or the role of defense counsel with calling their defense the hey batta batta defense. See (Tr. at 2992, 2994).

Suggesting or implying to the jury that defense counsel is to prevent the jury from discerning the truth is improper. See U.S. v Vaccaro, 115 F.3d 1211, 1218 (5th Cir 1997) (prosecutor's state-ments to the jury that it was the job of defense attorneys to muddle the issues was clearly improper). Therefore, trial counsel was in-effective for failing to object to the hey batta batta argument.

Movant has suffered a grave injustice due to the prejudice caused by counsel's ineffectiveness when counsel failed to object to the clearly improper argument.

movant urges this court that an evidentiary hearing is necessary in this instant.

14). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO OBJECT TO INADMISSIBLE HEARSAY LATIN KING MANIFESTO DOCUMENTS.

Movant's sixth amendment right to be confronted with the witnesses against him was violated when counsel failed to object to the admission into evidence an alleged Latin King Manifesto authored by non-testifying, unindicted, unknown individual that was employed by the government to infer agreement in the R.I.C.O. conspiracy. Counsel was ineffective for failing to object to the admission and reading of the manifesto by surrogate witness.

The alleged Latin King Manifesto should have never been admitted into evidence in this case for it had no bearing on movant's guilt or intent of the alleged crimes mentioned in said indictment. The manifesto that was read to the jury and the court was not more probative than it was prejudicial to movant's defense.

The author of the manifesto did not testify at movant's trial to the substance of the manifesto, therefore leaving this evidence as mere hearsay. See (Fed.R.Evid. 801). And does not fall under the business record exception to the hearsay rule. Hence the manifesto's admission into evidence and it's reading was not admissible.

The sixth amendment states that "in all criminal prosecutions, the accused shall enjoy the right...to be confronted with the witnesses against him". The confrontation clause requires that a crim-

inal defendant be afforded meaningful opportunity to cross examine witnesses against him. Crawford v. Washington, 541 U.S. 36 (2004). Counsel's representation in this capacity was not one that is guaranteed by the sixth amendment. Counsel's performance fell below that of competent representation when counsel failed to object to the admission and reading of manifesto.

Movant has suffered a grave injustice due to the prejudice caused by counsel's ineffectiveness, when counsel failed to object to the admission of manifesto and the reading of this manifesto by surrogate witness.

Here movant was deprived of his fundamental constitutional right to confront the author of the alleged manifesto. Furthermore, this manifesto prejudiced movant drastically due to the way the government structured the case as a Latin King enterprise.

Movant urges this court that an evidentiary hearing is necessary in this instant.

15). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO INVESTIGATE AND CALL AS WITNESSES THE ALLEGED MIQUEROS REGARDING THE ALLEGED THREATS AND EXTORTION.

At trial the prosecutor presented knowing false testimony by and through witness Ruben Caquias that the Latin Kings were extorting the miqueros.

Although the government has the burden of proof, for some apparent reason, the extorted miquero victims were not called to testify by the prosecution, and much to movant's surprise he was inexplicably found guilty of such extortion charge by the jury.

At all times relevant, Julio Leija Sanchez, who was convicted as the lead defendant in the miqueros trial, and who was incarcer-

at the time of movant's trial was available and willing to testify on behalf of movant's defense. Had Mr. Mejia Sanchez been called as witness at trial he would have testified that no such extortion existed. See (Attached Affidavit of Julio Leija Sanchez).

The Seventh Circuit has held that counsel has a duty to contact a potential witness unless counsel can make a rational decision that investigation is unnecessary. See Montgomry v. Peterson, 846 F.2d 407, 413 (7th Cir 1988) and that an attorney who fails even to interview a readily available witness whose non cumulative testimony may potentially aid the defense should not be allowed automatically to defend his omissions simply by raising the shield of trial strategy and tactics. See Crisp v. Duckworth, 743 F.2d 580, 584 (7th Cir 1984).

On several cases the Seventh Circuit has found counsel ineffective for failing to investigate and call witnesses. See Sullivan v. Fairman, 819 F.2d 1382 (7th Cir 1987); Bruce v. U.S., 256 F.3d 592 (7th Cir 2001; U.S. v. Ex Rel Hampton v. Leibach, 347 F.3d 219, 246-56 (7th Cir 2003); Davis v. Lambert, 388 F.3d 1052 (7th Cir 2004); Raygoza v. Hulick, 474 F.3d 958 (7th Cir 2007) Adams v. Bertrand, 453 F.3d 428, 436 (7th Cir 2006) (ineffective assistance where counsel failed to investigate witness that could have swung the case in client's favor. Such is the case here. Mr. Julio Leija Sanchez would have swung the case in movant's favor. Indeed, he would have supported and proved the fabrication and presentation of false testimony of the prosecution.

Movant hassuffered a grave injustice due to the prejudice caused by counsel's ineffectiveness when counsel failed to investigate and call Julio Leija Sanchez as witness.

Under the circumstances here, the government had the burden to show a strategy supporting the failure to interview the miquero's leading defendant Julio Leija Sanchez.

Movant urges this court that an evidentiary hearing is necessary in this instant.

16). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL COUNSEL FAILED TO OBJECT TO EXPERT TESTIMONY ON INTERSTATE COMMERECE ELEMENT.

In this case the government presented the expert testimony of ATF agent at trial to prove the interstate commerce of the fire arm. This sort of testimony is normally used when the government is proving a case of felon in possession. However in this case no one was charged with felon in possession. Therefore, there was no reason to present this testimony and counsel was ineffective for failing to object to this form of expert testimony.

Movant has suffered a grave injustice due to the prejudice caused by counsel's ineffectiveness when counsel failed to object to such testimony bearing on the jurisdictional element in this case.

Movant urges this court that an evidentiary hearing is necessary in this instant.

17). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO MOVE FOR DISMISSAL OF THE INDICTMENT BASED ON GOVERNMENTAL OVERREACHING AND MANUFACTURED JURISDICTION.

The R.I.C.O. Statute itself makes clear that an effect on interstate commerce is an element of the federal offense charged in the indictment. See 18 U.S.C. § 1962 (a) (b) and (c).

In this case counsel was ineffective for failing to raise a governmental overreaching challenge that the government overinvolvement in the drug scheme with Shanna along with the false testimony of extortion resulted in the creation and maintenance of the interstate commerce element of the offense charged in the indictment.

Not only was Shanna falsely creating the interstate commerce element of the offense charged in the indictment. Shanna was also creating and provoking the violent acts/violations infurtherance of the alleged Racketeering.

It is clear that there was no existing actual conspiracy to commit a R.I.C.O. before Shanna appeared and attempts to manufacture the R.I.C.O. and extortion case under the direction of his cohorts FBI Agents.

*** This Court should note that the commencement of the drug conspiracy alleged in the indictment began as early as September of 2007 and that there is no proof of extortion other than Shanna's false testimony. Therefore, it is fair to say that movant is a victim of Shanna's manufacture R.I.C.O. Scheme.

Ordinarily, a criminal defendant's allegations of governmental overreaching or prosecutorial misconduct arises in the defense of entrapment. When a defendant pleads the defense of entrapment, he has the burden of showing that the law enforcement officials induced him to commit a crime that he was not predisposed to commit and that the government implanted the criminal design in his mind. U.S. v. Russell, 411 U.S. 423, 433, 436 (1973). A claim of governmental overreaching, however, is a distinct and different defense in which the defendants contend that the government's involvement in the R.I.C.O. Scheme was so pervasive and outrageous that the due process

principles of the court's power of supervision over the criminal justice system requires that the indictment be dismissed.

Several courts of appeals have recognized that in some circumstances convictions obtained through egregious misconduct by government agents involved in the creation and maintenance of the criminal activities would be vacated. See U.S. v. Twigg, 588 F.2d 373, 381 (3rd Cir 1978); U.S. v. Archer, 486 F.2d 670, 676-77 (2nd Cir 1973); Green v. U.S., 454 F.2d 783, 787 (6th Cir 1971). The Fifth Circuit has agreed that in certain situations, a defense of governmental misconduct, seperate and distinct from the defense of entrapment, may bar a criminal prosecution on due process grounds. In U.S. v. Graves, 556 F.2d 1319, 1324 (5th Cir 1977), the court ruled that " "there is still available in appropriate cases a governmental misconduct defense grounded on the dual principles of due process and the supervisory powers of the court, but such a defense does not fall within the narrow confines of 'entrapment' as the term has been explicated in Russell and Hampton". Therefore, governmental overreaching presents a cognizable and legitimate defense. Similarly, artificially created jurisdiction also presents a cognizable defense.

The words of Shanna in a letter that he wrote to the FBI Agents are that without him you guys have nothing. I tried to get you that R.I.C.O. shit.

Movant has suffered a grave injustice due to the prejudice caused by counsel's failure to move for dismissal of the indictment based on the above stated defenses.

Movant urges this court that an evidentiary hearing is necessary in this instant.

18). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE TRIAL AND APPELLATE COUNSEL FAILED TO CHALLENGE THE LACK OF OVERT ACT.

In this case there was no proof of an overt act committed in-furtherance of the extortion conspiracy nor was there any overt act alleged. Therefore, there is insufficient evidence to convict movant.

In U.S. v. Corson, 579 F.3d 804, 814 n. 1 (7th Cir 2009) the Seventh Circuit noted that some of our decisions list an overt act as an element of Hobbs Act citing U.S. v. Stodola, 953 F.2d 266, 272 (7th Cir 1992) (to prove conspiracy to commit extortion, the government was only required to prove that there was an agreement between two or more persons to commit an unlawful act, that the defendant was a party to the agreement, and that an overt act was committed in furtherance of the agreement by one of the coconspirators, quoting U.S. v. Tuchow, 768 F.2d 855, 869 (7th Cir 1985).

Movant has suffered a grave injustice due to counsel's failure to challenge the lack of overt act.

Movant urges this court that an evidentiary hearing is necessary in this instant.

19). MOVANT WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO OBJECT ON THE GROUND THAT CROSS REFERENCE OF 2A1.1 FIRST DEGREE MURDER AND ATTEMPTED MURDER COMES INTO CONFLICT WITH THE CONSTITUTION AS APPLIED TO MOVANT.

In this case the government employed the 2A1.1 cross reference tactic to obtain movant's long sentence.

Movant nor the Latin Kings were charged with murder in the indictment. Therefore, holding Movant accountable for murders and attempted murders attributable to the Latin Kings violates the pre-

sentment clause of the fifth amendment to the U.S. Constitution.

The presentment clause of the fifth amendment guarantees in part that no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a grand jury. See Ex Parte Bain, 121 U.S. 1 (1887). This prerequisite is jurisdictional and no court has authority to try a prisoner without indictment or presentment in such cases.

The crimes charged here is first degree and attempted murders which are felonies and the fifth amendment requires that prosecution be begun by indictment.

Movant has suffered a grave injustice due to counsel's failure to properly challenge the cross reference on the above stated jurisdictional grounds.

Movant urges this court that an evidentiary hearing is necessary in this instant.

REQUEST FOR AN EVIDENTIARY HEARING

Unless the motion and the files and records of the case conclusively show that movant is entitled to no relief, the court should grant a prompt hearing. 28 U.S.C. § 2255; See also Machibroda v. U.S., 368 U.S. 487, 493-96 (1962); Bruce v. U.S., 256 F.3d 592, 597 (7th Cir 2001)(where record does not negate claims of ineffective assistance and allegations, if true would warrant relief, evidentiary hearing is required).

CONCLUSION

An evidentiary hearing should be held. Thereafter, Movant's § 2255 should be granted.

Dated on this 11 day of January, 2016.

Respectfully submitted

By Vicente Garcia

VICENTE GARCIA
43509-279

USP Big Sandy
P.O. Box 2068
Inez, KY 41224

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| VICENTE GARCIA, Movant, | * | Criminal Case No. 08-CR-746 |
| VS. | * | |
| UNITED STATES OF AMERICA, Respondent, | * | Civil Case No. ________ |

VICENTE GARCIA's EXHIBITS IN SUPPORT OF
28 U.S.C. § 2255 MOTION

TRANSCRIPT OF LAY TESTIMONY ON INTERPRETATION OF PHONE CONVERSATIONS

EMAILS FROM COOPERATING INFORMANT

AFFIDAVIT OF JULIO LEIJA SANCHEZ (Miquero)

Dated on this 11th day of January, 2016

Respectfully Submitted

By *Vicente Garcia*
VICENTE GARCIA
#43509-279
USP Big Sandy
P.O. Box 2068
Inez,KY 41224

Exhibits 1 and 2, which have previously been admitted into evidence, okay?

A. Okay.

Q. And, sir, I've taken back from you Exhibits 299 and 54 and 55.

Now, Government Exhibit 1, do you understand that to be a recording?

A. Yes.

Q. Okay. And have you listened to Government Exhibit 1 previously?

A. Yes.

Q. In fact, did you assist in the preparation of a transcript of Government Exhibit 1?

A. Yes.

Q. What is that?

A. The CD you are talking about?

Q. Okay. Is the CD Government Exhibit 1?

A. Yes.

Q. And what is Government Exhibit 2?

A. The transcripts of CD 1.

Q. Okay. So it matches up with Government Exhibit 1?

A. Yes.

Q. Was this a conversation that you had on July 31st of 2004?

A. Yes.

Q. With whom?

A. With Mr. Zambrano.

MR. PORTER: Your Honor, may we have -- may we publish Government Exhibit 1 and have the jurors turn to Government Exhibit 2?

THE COURT: Proceed.

BY MR. PORTER:

Q. Sir, I'm going to have the entire recording played, okay, and then I'm going to ask you a few questions.

A. Okay.

(Government Exhibit 1 played in open court.)

BY MR. PORTER:

Q. Do you recognize the voices on that recording?

A. Yes.

Q. Whose are they?

A. It's myself and Mr. Zambrano.

Q. Just as a preliminary matter, at the very end of the call -- and it's referenced on page 2 of the transcript at the bottom -- there are a couple of instances in which Mr. Zambrano speaks Spanish, is that right?

A. Yes.

Q. Now, what he says is not contained within the transcripts, is that right?

A. Correct.

Q. It is just a notation that at that point there is Spanish being spoken?

A. Correct.
Q. Do you understand some Spanish?
A. Yes.
Q. Did you understand what he was saying in those two instances?
A. Yes.
Q. What was he saying?
A. He just said that -- he used the word vieja, meaning his old lady was sleeping anyway, so just that's all he said, you know. He didn't say nothing.
Q. Okay. Now, at the beginning of the recording -- and it's referenced on page 1 at line 11 -- you say words to the effect of this is the head, the Old Man, Old Man.
Do you recall saying those words?
A. Yes.
Q. Who were you talking to?
A. To the King brothers that were with me, that were standing outside with me.
Q. Who were you referring to when you said this is the head?
A. I was talking about Mr. Zambrano.
Q. And now in July of 2004, were you cooperating with the federal government?
A. No, I wasn't.
Q. Were you a member in good standing of the Latin Kings?
A. Yes. I was a full-blooded active member of the Latin Kings.
Q. At another point -- and it's referenced at the top of the

second page of the transcript -- you say words to the effect of we heard -- we heard you sent down, you know, we got the message you sent to us.

Do you recall saying those words to him?

A. Yes.

Q. What were you referring to there?

A. Mr. Zambrano had just recently came home from prison, and I was given a direct order by the Supreme Inca that we are to have security outside, you know, just in case he shows up. So we had to be outside. We had to do mandatory security just, just in case he wanted to come.

Q. Come where?

A. Well, he would visit our bar. He would visit our restaurant. He would visit us.

Q. And you talked about this some the other day?

A. Yes.

Q. Some bars in the Summit area?

A. Yes.

Q. Okay. Excuse me.

Mr. Zambrano after that referenced a man named Ramon, do you see that?

A. Yes.

Q. Do you have an understanding as to who that individual was?

A. Yes.

Q. Who is that?

A. That's Trouble. He is a member of the Latin Kings.
Q. Do you know his real name?
A. Yes.
Q. What was his real name?
A. Ramon Ceballos.
Q. That's C-e-b-a-l-l-o-s?
A. To the best of my spelling, yes, I believe so.
Q. Okay. And Mr. Ceballos, did you have any dealings with him?
A. Yes.
Q. In July of 2004 into 2005, what kinds of dealings did you have with him?
A. He was my drug supplier and I was his drug supplier.
Q. What does that mean?
A. Well, you know, I sold drugs. And in order for to sell drugs people have to give me the drugs. And he was one of the individuals that would give me drugs if I needed them.
And then again, I would receive drugs from other sources and I would give him drugs when he needed them. Kilos, that is.
Q. Did there come a point in time after this phone call where you provided Mr. Ceballos with cocaine?
A. Yes.
Q. Approximately when?
A. Late '04, early '05.
Q. Approximately how much?
A. Between 15 and 20 kilos.

Q. And the cocaine that you gave to Mr. Ceballos, where did you receive it from?
A. I received it from my supplier, Primo.
Q. Where did he operate out of?
A. From LA.
Q. Los Angeles?
A. Yes. Los Angeles.
Q. So these 15 to 20 kilos that you supplied Mr. Ceballos, how was the payment worked out?
A. Well, we always give the narcotics or the cocaine on credit. It's not like -- you know, it's not like you see in the movies, a big drug deal. No.
You know, if he was giving me five or ten kilos, I'd have 30 days to pay it back. And if I was giving him ten, 15 kilos, give him a month.
I mean it might only take two weeks. It might take 31 days. You know, it varies. And that's how we operated. That's how we did it.
Q. So in this deal that you referenced, this 15 to 20 kilos of cocaine in late '04 or early '05, what was the arrangement?
A. I gave him -- like I said, I'm not exactly if it was 15 or if it was 20, I'm not positive with the number. But I gave him X amount of kilos, and he had a month to pay me back my money.
Q. How much did he owe you?
A. Over a quarter of a million dollars.

Q. Did there come a point in time when you involved Mr. Zambrano in that deal?
A. Yes.
Q. Why?
A. I thought Mr. -- I thought Trouble wasn't going to pay me. I thought Mr. Ceballos wasn't going to pay me. And I was worried that he wasn't going to pay me.
So I asked him, can you just tell him to talk to me, let me know something you know, we'll work something out.
I didn't want to get stiffed. I didn't want to get burned for the money.
Q. When did you go to Mr. Zambrano on this business?
A. Early '05.
Q. Talk to him in person or over the phone?
A. No. In person.
Q. Why did you to go Mr. Zambrano?
A. Well, because I could. You know, he is -- you know, I had that relationship with him. But I also knew Ramon had a relationship with him too.
And I was scared that Ramon would beat me to the punch and tell him, man, I can't pay. Latin Kings ain't paid me before. It happens. We come up with any type of excuse not to pay you back, you know.
And I figured if I beat him to the punch, I have Mr. Zambrano on my side before he gets him on his side.

Q. Is there a rule in the Latin Kings literature about debts?
A. Yes.
Q. What's the rule?
A. No King shall incur a debt that he cannot afford to pay.
Q. Did you consider this business with you and Mr. Ceballos to be at least in part Latin Kings' business?
A. Yes. Yes. Yes, it was.
Q. After talking to Mr. Zambrano, do you know whether he talked to Mr. Ceballos?
A. Yeah, actually I do.
Q. How do you know that?
A. Because me and -- me and Mr. Ceballos talked after he talked to him. And he was a little upset with me. You know, we are King brothers, we are friends too, you know, he was like, you made me look bad, bro', you could have waited to talk to me.
What do you mean waited? It's been two and a half months. You avoided me for a whole month and a half.
And he was upset because I made him look bad. He was now you got the Viejo thinking that I can't -- you know, that I'm a bum, I'm broke, I can't pay my bills, you know.
We joked about it. It wasn't like a heated conversation. But he let me know, why you make me look bad.
Q. After you talked to Mr. Zambrano, did that quarter million dollar payment -- or, did that quarter-million-dollar payment -- or that quarter-million-dollar debt from Mr. Ceballos get

Q. And to just short-circuit this a little bit, do Government Exhibits 4 and 6, do they contain the transcripts of the conversations on Exhibits 3 and 5?

A. Yes.

Q. And do Government Exhibits 4 and 6 truly and accurately transcribe to the best of your ability certain conversations that you had in October of 2004?

A. Yes.

Q. Sir, I want to play both of these back to back for you. And then I'm going to ask you some questions.

But before we do, who are the participants in these two calls?

A. Myself and Mr. Zambrano.

MR. PORTER: Your Honor, if we could collectively be directed to Government Exhibits 4 and then 6?

THE COURT: Yes. You may proceed.

(Government Exhibit 3 played in open court.)

MR. PORTER: Sir, before we get to that, we are going to play Government Exhibit 5, which matches up to Government Exhibit 6, okay?

THE WITNESS: Okay.

(Government Exhibit 5 played in open court.)

BY MR. PORTER:

Q. Do you recall these conversations?

A. Yes.

Q. Now, in your first conversation that we played on October 13th of 2004, it's referenced to page 2 of the transcript at lines 4 and 5, you say words to the effect of can you come outside and sit in my car so we could talk or -- or at least in the backyard or whatever.

Do you recall saying that?

A. Yes.

Q. Why were you making that request of Mr. Zambrano?

A. Because I wanted to talk to him about Latin King business and, you know, I needed privacy.

Q. Did you meet with him later that night?

A. Yes.

Q. In fact, was that the purpose of the second call that we played?

A. Yes. It was letting him know that I had arrived.

Q. Did you thereafter then meet with Mr. Zambrano?

A. Yes.

Q. What was it that you wanted to talk to him about that day?

A. Well, I had several issues that I wanted to bring to his attention.

Q. What were they?

A. Well, first there was that I had just came from a meeting with my Regional Inca, and which is Cuz, and he had ordered me not to be associating with Mr. Zambrano; that it was a direct order, and that I would be violated.

Because I had just recently -- he thought that I had purchased a vehicle for Mr. Zambrano, and it made him look bad. And I was drawing heat to Mr. Zambrano.

So they gave me a direct order not to hang out with him.

Q. When you say they, who are you referring to?

A. My Regional Inca told me it came from the Supreme Inca, not to be doing -- doing those type of things anymore, and don't be -- you know, don't do that anymore.

Q. Was there other business that you wanted to discuss with Mr. Zambrano that day?

A. Yes.

Q. What else?

A. A fellow Latin King by the name of Bam, I wanted him to transfer.

Well, he -- he was looking for a transfer, and I wanted to accept him into our neighborhood. And it was all fine and everything, but he comes from Harlem.

And they were putting up little obstacles not to allow us to -- to come into our chapter. So I was taking it to him, seeing, you know, what his point of view was. If he would intervene on my behalf in letting them know to let him go, you know, let him come our way.

Q. Was there any other Latin Kings' business you wished to discuss with him that day?

A. Yes. We -- we as being Lenzi Latin Kings, there was rumored

that -- you know, we come from a project. It's eight buildings. And it was rumored that they had been sold to a company and they were going to knock it down and put up a Walmart, or whatever, you know.

So we wanted to open up another chapter. And we wanted to open up a chapter in deep Summit. And I wanted to, again, get his permission, to see if he would allow us to open up a neighborhood down there, because the Harlems, again, were being uncooperative with us moving down there. Because they were losing a third of their hood.

Q. Let's talk a little more about each of those. Well, let me ask, was there anything else -- any other Latin Kings' business?

A. No, that was -- were the three topics that I went to talk to him about.

Q. So this first topic concerned an order that you had received from your Regional Inca?

A. Yes.

Q. And how did you and Mr. Zambrano resolve that issue?

A. Told me don't worry about it because -- I just went to ask him if that's what he wants. If he would have told me, you know what, follow your orders, then that's exactly what would have happened.

He told me don't worry about it. He will take care of it.

Q. Then the second issue was this issue concerning the transfer

of this member, is that correct?
A. Correct.
Q. Did you testify about that the other day?
A. Yes.
Q. And how do you and Mr. Zambrano resolve that issue?
A. Well, he -- I set up a meeting with him and my Regional Inca so that he can, you know, lean -- be on our side and say hey, you know, because the Harlems wanted their money first.

When you transfer as a Latin King, you have to have all your money paid, you have to be in good standings, you know. There is a procedure, you know. You just don't: One day you're here, and the next day you are there, you know.

And they wanted their money. So Lenzi Latin Kings paid it.

Then they said he owes us a gun. So the Lenzi Latin Kings gave them a replacement weapon.

The thing we were complaining about is now they said they wanted to beat him up for three minutes. And we were like, that's not fair. That's against our rules. You just can't want to punish him because he was going from one set to the next set. And that's where we were bickering and arguing over that part, because they wanted to hurt him. So you are hurting somebody. So --
Q. How was that ultimately resolved?
A. We had a meeting at Jackie's, me, Mr. Zambrano, the Inca of

Harlem, Bam Bam, my Inca, the Regional Inca for us, Cuz. We walked into the bar, and when he -- when Bam Bam walked in he was a Harlem Latin King, and when we left he was a Lenzi Latin King.
Q. Without being violated?
A. No. But we paid -- we did everything else though, you know. We met all the requirements. 30 days. We did everything that we were supposed to do.
Q. Then the third issue was this looming redevelopment of the Summit area in terms of the restructuring or a movement of a section, is that right?
A. Correct.
Q. What was the result of your conversation with Mr. Zambrano on that issue?
A. He was -- he was very positive with me. Like he understood why we wanted to leave. He was for us. I mean, we're Latin Kings. We just need an area, you know. We are going to be Latin Kings but we have to have a home.
He was -- you know, he was with me on that.
MR. PORTER: Judge, is this a good time for a break or should we press forward?
THE COURT: It's about 11:25 or so.
Members of the jury, do you want a break now or shall we proceed? If it's a break, raise your hand.
Proceed.
MR. PORTER: Thank you, your Honor.

THE COURT: Try to come to a stopping point at noon.

MR. PORTER: Okay.

BY MR. PORTER,

Q. Sir, again, I want to trade you. I'm going to hand you what's been marked as Government Exhibits 17 and 18, already received in evidence. And I'll take back that which you have, okay?

Sir, just let us know when you are familiar with those two, okay?

A. I'm ready.

Q. Okay. Have you -- this is again the same pairing of disk and transcripts, is that correct?

A. Correct.

Q. Okay. And did you help to finalize the transcript contained in Government Exhibit 18?

A. Yes.

Q. Does the transcript truly and accurately depict to the best of your abilities the conversation contained within Government Exhibit 17?

A. Yes.

Q. Now, who were the participants in the conversation in Government Exhibit 17?

A. Mr. Zambrano and Mr. Montoya.

Q. Mr. -- let's talk about Mr. Montoya for a minute. Who is that?

A. He is another member of the Latin Kings.
Q. Okay. And I think you've testified a little bit about him previously.
Does -- in your understanding does he have some sort of familial relationship with Mr. Zambrano?
A. That's his brother-in-law.
Q. And by May of 2005, had you met Mr. Montoya?
A. Yes.
Q. About how many times?
A. 50.
Q. Are you familiar with his voice?
A. Yes, sir.
Q. Do you recognize his voice on Government Exhibit 17?
A. Yes.
MR. PORTER: Your Honor, I'd play Government Exhibit 17.
BY MR. PORTER:
Q. And sir, again, we will play it and then I'm going ask you some questions, okay?
THE COURT: You may proceed.
If the tape is 17, what is transcript number?
MR. PORTER: Transcript 18, your Honor.
THE COURT: All right. Proceed.
(Government Exhibit 17 played in open court.)
BY MR. PORTER:
Q. Sir -- and it's referenced on the second page of the

transcript. Mr. Zambrano refers to someone named Clancy, do you recall that?
A. Yes.
Q. Who is that?
A. Clancy, he is one of our attorneys.
Q. And on the third page of the transcript it's referenced beginning at line 14, Mr. Zambrano says words to the effect of I got to make a stop first over there by Frankie's.
Do you recall him saying that?
A. Yes.
Q. What did you understand him to mean when he says Frankie's?
MR. GRAHAM: Objection, Judge. It's not a part of this conversation.
THE COURT: Overruled.
You may answer.
BY THE WITNESS:
A. That's Frankie's and Johnny's, that's our bar. That's what we'd -- we'd say Frankie's. The Bar. You know, Frankie's and Johnny's. That's our bar, Latin King bar.
BY MR. PORTER:
Q. Is that the same bar where the incident occurred that we played earlier this morning on May 28th of 2006?
A. Correct.
Q. Now, Mr. Zambrano says words to the effect of put somebody in check, put somebody in check real quick. And then from there I

got to roll.

Do you recall him saying those words on the recording?

A. Yes.

Q. What do you understand him to be referring to there?

MR. GRAHAM: Objection, Judge.

THE COURT: Overruled.

You may answer.

BY THE WITNESS:

A. That he is going -- a member of the Latin Kings is about to be disciplined, you know, verbally, physically, I really don't know.

But that's street slang. When you say you are going to put somebody in check, you know, you are going to put them in their place. He is going to have a conversation with a Latin King, and if the Corona is doing it, it's not good. It's not a good thing.

BY MR. PORTER:

Q. Did Mr. Montoya have any sons?

A. Yes.

Q. How many?

A. He has two sons.

Q. What are their names?

A. Danny Montoya, Jr. and David Montoya.

Q. You've testified -- they are the same individuals -- you've testified a little bit about them the other day, is that right?

A. Correct.
Q. I want to show you what's been marked as Government Exhibits 19 and 20. And if I can again trade out with that which you have there.
Sir, Government Exhibits 19 and 20 have been admitted into evidence. Take a look at those and just let me know when you are familiar with them?
A. I'm ready.
Q. Okay. Have you listened to Government Exhibit 19?
A. Yes.
Q. Did you assist in the preparation of the transcript on Government Exhibit 20?
A. Yes.
Q. Does Government Exhibit 20, to the best of your ability, transcribe a conversation involving Mr. Zambrano and another individual that's contained on Government Exhibit 19?
A. Yes.
Q. Do you recognize the voice of the other individual in that telephone call?
A. Yes.
Q. Who is it?
A. That is Sinister, Danny Montoya, Jr. He is a member of the Midway Latin Kings.
Q. In May of 2005 had you met him?
A. Yes.

Q. How many times?
A. A hundred.
Q. Were you familiar with his voice?
A. Yes.
Q. Do you recognize his voice to be that which is contained on Government Exhibit 19?
A. Yes.
MR. PORTER: Your Honor, may I play Government Exhibit 19?
THE COURT: And using transcript 20?
MR. PORTER: Yes.
THE COURT: Proceed.
(Government Exhibit 19 played in open court.)
BY MR. PORTER:
Q. In May of 2005 was it your understanding that Daniel Montoya, Jr., was a Latin King?
A. Yes.
Q. What area or what section was he a member of?
A. He is a Midway Latin King.
Q. At that time did you understand him to have any rank within the Midway Latin Kings?
A. To the best of my knowledge, he was one of the top three.
Q. When you say the top three, what do you mean?
A. Enforcer, Casique or Inca.
Q. In general terms, what's your understanding of why

Mr. Montoya is calling Mr. Zambrano?

MR. GRAHAM: Objection, Judge. He is not part of the conversation.

THE COURT: Sidebar on this point.

(Proceedings heard at sidebar:)

THE COURT: I overruled your objection earlier.

The point is he does not have to be a party to the conversation to give his understanding of the significance of words or phrases used by other co-conspirators.

In a case on point that I keep referring to, in the McAnderson case, the witness who had knowledge of the inner workings of the organization also had knowledge of a code that was used. And so that he, the knowledgeable member of the co-conspiracy, could explain to the jury the significance of words or phrases, even where he was not a member or party to the conversation.

So that, for example, when Jeff Fort said something to someone else, this witness could explain the significance of it, to make sense of it, so that the jury could understand and give appropriate weight to the words being spoken.

And so maybe in another case being a party to the conversation or not being a party to the conversation may be a reasonable basis for an objection. But not when we are talking about statements amongst co-conspirators, where one knowledgeable co-conspirator could say when he used the word Frankie's, he

meant Frankie and Johnny's. Or when he said, as in the other case, we're going to the fort, the significance of what that meant and where it would take place.

And so that's the basis to say that this witness can say to the jury my understanding of the meaning of that word is this. He can be wrong, of course, but his statement from the witness stand is admissible.

That's the point.

MR. GRAHAM: Judge, my point is that when this witness talks about a particular phrase in a transcript, he is reaching into either Mr. Montoya's mind or Mr. Zambrano's mind. And I'm objecting to it because he is not a part of that conversation.

But I understand your Honor's ruling.

THE COURT: Well, I want to return. That last question was -- could have been improved. So I will sustain the objection to say rephrase that question, because it could suggest that this is mindreading on the part of the witness, as opposed to understanding or analysis or some explanatory statement.

And so if you remember what your question was --

MR. PORTER: I do.

THE COURT: You do. Can you rephrase it?

MR. PORTER: What I was -- the reason for that question was he was going to describe his understanding in general of the conversation based on his years of experience that he has testified to as a Latin King, his years with Mr. Zambrano, his

understanding of literature, et cetera.

So I was trying to just set the table. But I can go directly into different statements that were made.

But --

THE COURT: Well, if you -- with an abundance of caution I will sustain the objection to the form of the last question.

But if the question really was attempting to get at what I just commented about, then that question, properly phrased, would have been all right.

But the witness should of course not be in a position to read minds. And I guess Mr. Graham is suggesting that's what the answer would be. It would be speculative on his part.

All right. So you can either rephrase that question or move on.

MR. PORTER: I'll make sure that we phrase the questions and make clear that we are talking about is the witness' understanding, and not -- and not an effort at mindreading.

THE COURT: All right. So what he has laid a foundation for the last couple of days here for -- to be the basis for him to say the things he is saying about the significance of words and the actions of various parties.

Okay.

(Proceedings heard in open court:)

THE COURT: Mr. Porter, you may rephrase the question or ask a new one.

MR. PORTER: Thank you, your Honor.

BY MR. PORTER:

Q. The -- as part of that conversation, Mr. Montoya, as referenced on page 1 at lines -- starting at line 15 of the transcript, said words to the effect of I was asking you to come but, you know, if you don't want to then that's -- you know, that's your call. You know what I mean. I was asking you 'cause I kind of wanted you to come.

Do you recall Mr. Montoya saying those words on tape?

A. Yes.

Q. Do you have an understanding as to what he was referring to when he said those words?

A. Mr. Montoya, Jr. is asking Mr. Zambrano to come to a meeting with him.

Q. A Latin Kings meeting?

A. Yes.

Q. Now, Mr. Zambrano responds by saying words to the effect of yeah, but they're not going to do nothing to nobody.

Do you recall him saying those words on the tape?

A. Yes.

Q. Do you have an understanding as to what Mr. Zambrano was referring to there?

A. No one was going to get violated.

Q. Later Mr. Zambrano, as captured on page 2 at line 12, said words to the effect of it shouldn't be nothing bad, so --

Do you recall him saying those words?
A. Yes.
Q. Do you have an understanding as to what he is referring to there?
MR. GRAHAM: Judge, I'd have the same objection.
THE COURT: All right. Sustained.
BY MR. PORTER:
Q. Later Mr. Zambrano, as referenced on lines 26 and 27 of page 2, says words to the effect of if that's the case, the other ones would have got it mandatory.
Do you recall that statement?
A. Yes.
Q. That term mandatory, is that a term that you understood to be used by Latin Kings?
A. Yes.
Q. What's it mean?
A. Well, mandatory can mean -- you know, you have mandatory bust-out days, which is mandatory security.
You have mandatory meetings. When the Regional calls a meeting, it's a mandatory meeting.
And the relevance to this is when Latin Kings, when we fight each other, it's mandatory that both parties get dealt with. So it's not one-sided, you know. It's none of that pointing your fingers, oh, he started it.
No, it's mandatory for both of yous to be dealt with.

So it's no favoritism.
Q. Do you have an understanding as to the reference as found on page 2 at line 27?
A. Yes.
Q. What's your understanding?
MR. GRAHAM: Objection, Judge. He is not part of this conversation.
THE COURT: I have overruled objections on that ground.
The witness may answer the question.
BY THE WITNESS:
A. Well, he is reassuring them that if -- the other guys only got talking to. And if they would have got disciplined, it would have been mandatory for them to get disciplined. So he is reassuring Mr. Montoya, Jr. that, you know, you are on the same -- it's the same. We're not treated differently in incidents. It's the same punishment for everybody.
BY MR. PORTER:
Q. Mr. Zambrano also says words to the effect -- and they are referenced on line 23, page 2 -- he's not supposed to do none of that, you know. All right.
Do you recall those words being spoken by Mr. Zambrano?
A. Yes.
Q. Do you have an understanding as to who he was referring to when he says he, he's not?
A. The Supreme Inca. That is Mr. Fernando King.

Q. And then finally on this conversation, sir, there is a reference -- and it's found on page 3, lines 13 and 14 of the transcript -- Mr. Zambrano says words to the effect of, you know, mainly, I think he gonna talk to you guys, that's about it, you know.

Do you recall him saying those words?

A. Yes.

Q. Do you have an understanding as to who Mr. Zambrano is referring to when he says, he gonna talk to you guys?

A. Mr. King.

Q. Sir, you can put that one aside. I'm going to make another trade with you, if I can.

I'm going to hand you what's been marked and admitted into evidence as Government Exhibits 21 and 22.

Sir, as before, just let us know when you are done reviewing those items.

THE COURT: All right. Mr. Porter, this may be a good stopping time.

Members of the jury, you are excused until 1:00 o'clock.

(Jury out.)

THE COURT: Okay. The jury has left the room. If there is nothing further, then 1:00 o'clock.

MS. DE PODESTA: Thank you.

MR. DIAMANTATOS: Thank you, Judge.

(Proceedings recessed from 12:00 p.m. to 1:00 p.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
) No. 08 CR 746
vs. ) Chicago, Illinois
) March 7, 2011
AUGUSTIN ZAMBRANO, VICENTE ) 1:00 p.m.
GARCIA, ALFONSO CHAVEZ and )
JOSE GUZMAN, )
)
Defendants. )

VOLUME 6
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE CHARLES R. NORGLE, SR.
AND A JURY

APPEARANCES:

For the Plaintiff: HONORABLE PATRICK J. FITZGERALD
United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
BY: MR. ANDREW C. PORTER
MS. NANCY L. DE PODESTA
MR. TINOS DIAMANTATOS

For Defendant Zambrano: LAW OFFICES OF JAMES A. GRAHAM
53 West Jackson Boulevard
Suite 703
Chicago, Illinois 60604
BY: MR. JAMES A. GRAHAM

Official Court Reporter: MAELLEN E. PITTMAN, FCRR, RDR
219 South Dearborn Street
Room 2342
Chicago, Illinois 60604
Maellen_Pittman@ilnd.uscourts.gov

APPEARANCES: (Continued)

For Defendant Garcia: BAUMGART and ASSOCIATES
39 South LaSalle Street
Suite 600
Chicago, Illinois 60603
BY: MR. FRANCIS BAUMGART

For Defendant Chavez: DOMINGO F. VARGAS and ASSOCIATES, LTD.
734 North Wells Street
Chicago, Illinois 60610
BY: MR. DOMINGO F. VARGAS

For Defendant Guzman: LAW OFFICE OF NISHAY K. SANAN
327 South Plymouth Court
Chicago, Illinois 60604
BY: MR. NISHAY K. SANAN
MR. STEPHEN F. HALL

(Proceedings heard in open court:)

MR. PORTER: Your Honor, before the jury comes in, defense counsel had requested --

THE CLERK: One issue.

THE COURT: Court is in session. Please be seated.

Okay. What is the issue?

MR. PORTER: Defense counsel had requested a brief opportunity to view the tattoo of the lion that Mr. Guajardo showed to the witnesses -- or, to us this morning.

I wanted to give them an opportunity to do that.

THE COURT: Wasn't it shown on the projecting units?

MR. PORTER: It was not. We don't have photos of that.

THE COURT: Certainly. Go right ahead.

(Discussion off the record.)

THE REPORTER: I can't hear you.

(Discussion off the record.)

THE REPORTER: Is this off the record, Judge?

THE COURT: Just a minute. You can look but not ask questions now.

And you may cross examine with respect to this later. But for now, it's just to get an observation.

MR. HALL: Yes, your Honor.

THE COURT: If later you choose to cross examine on the tattoos or related matters, you will have the opportunity to do so.

MR. DIAMANTATOS: Just for the record, Judge, all four of defendants' counsel had the opportunity to view the tattoos.

THE COURT: All right. Please ask the jury to come in.

(Jury in.)

THE COURT: Good afternoon, members of the jury.

Mr. Porter, you may proceed.

JESSE GUAJARDO, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (Resumed)

BY MR. PORTER:

Q. Sir, when we broke for lunch we were about to talk about another recording, is that right?

A. Correct.

Q. Before we do that, I wanted to show you a photograph, see if you can identify it, okay?

I'll hand you what's been marked as Government Exhibit 301.

I'm sorry. Let me show defense counsel.

Have you seen Government Exhibit 301?

A. Yes.

Q. Do you recognize the individual depicted in this photograph?

A. Yes.

Q. Who is it?

A. This is DK.

MR. PORTER: Your Honor, I would move into evidence Government Exhibit 301.

THE COURT: It is received.

(Government Exhibit 301 received in evidence.)

MR. BAUMGART: Excuse me, your Honor.

There is no reason. We have stipulated. This is Mr. Garcia.

THE COURT: The objection is overruled.

MR. PORTER: And, your Honor, permission to publish that photograph on the demonstrative we were using the other day.

THE COURT: Proceed.

BY MR. PORTER:

Q. You identified the man depicted in Exhibit 301 as holding a position in 2006?

A. Yes.

Q. What was that position?

A. He was a 26th Street Region Enforcer.

Q. Reporting to whom?

A. To Mr. Loks.

Q. And on this chart that we have the photo of the man, you know, Loks next to the Regional Inca?

A. Yes.

Q. Okay. And so this individual would be next to the Regional Enforcer?

A. Yes.

Q. Now, this is my mistake. Do you have exhibits in front of you?

A. Yes. 21 and 22.
Q. And that is a recording and a transcript consecutively?
A. Yes.
Q. Now, before we get to those, I wanted to hand you four other exhibits, Government Exhibits 23, 24, 25, and 26, which have previously been received in evidence.
Sir, take as much time as you need to familiarize yourself with those exhibits.
A. Okay.
Q. I don't think we have done this yet, so let's first turn to Government Exhibit 22. Do you have that in front of you?
A. Yes.
Q. Did you assist in the preparation of Government Exhibit 22?
A. Yes.
Q. Do you understand that to be a transcript of the recording contained within Government Exhibit 21?
A. Yes.
Q. Does Government Exhibit 22, does that transcript, to the best of your ability, transcribe the words spoken by the individuals contained on Government Exhibit 21?
A. Yes.
Q. Now, one of the individuals -- there are two individuals involved in that conversation, is that fair to say?
A. Correct.
Q. Who are they?

A. Mr. Zambrano and Mr. Rudy Rangel, Sr.
Q. Do you know Rudy Rangel, Sr.?
A. Yes.
Q. Who is he?
A. Well, I called him Kato. Big Kato.
Q. How many times have you met him?
A. Hundreds.
Q. And is he a Latin King?
A. Yes.
Q. What's his background within the Latin Kings?
A. Well, he is -- he is what we would call an elder. He doesn't hold no rank or no power, but, you know, he has a lot of respect amongst the soldiers.
Q. Did he have any family members who were involved in the Latin Kings?
A. Yes.
Q. Who?
A. His son.
Q. Who is his son?
A. Rudy Rangel, Jr.
Q. Did you testify about -- about Rudy Rangel, Jr., previously?
A. Yes.
Q. Can you refresh us who was he within the Latin Kings?
A. Well, he was Kato. His nickname was Kato too. And he was a highly respected Latin King. He was a Trumbull Latin King, and

he was murdered.

MR. PORTER: Permission to publish Exhibit 21?

THE COURT: Yes.

BY MR. PORTER:

Q. Sir, we are going to play Government Exhibit 21, which is -- corresponds with the transcript on Government Exhibit 22, okay?

A. Okay.

(Government Exhibit 21 played in open court.)

BY MR. PORTER:

Q. Now, sir, do you understand that this conversation occurred at approximately 12:20 a.m. on May 22nd, 2005?

A. Yes.

Q. Do you have Government Exhibit 23 in front of you?

A. Yes.

Q. Okay. And do you also have Government Exhibit 24 in front of you?

A. Yes.

Q. Have you listened to Government Exhibit 23?

A. Yes.

Q. Did you help to prepare a transcript that corresponds with Government Exhibit 23?

A. Yes.

Q. Do you recall that Government Exhibit 23 is essentially a voicemail message?

A. Yes.
Q. Whose voice is on the voicemail message?
A. Danny Montoya, Jr.
Q. You've testified about him?
A. Yes.
Q. What was his street name?
A. Sinister.
Q. And in May of 2005, did he have a position within the Latin Kings?
A. Yes.
Q. What was his position?
A. Enforcer.
Q. Enforcer for whom?
A. The Midway Latin Kings.
Q. Does Government Exhibit 24 accurately transcribe to the best of your ability the recording contained within Government Exhibit 23?
A. Yes.
MR. PORTER: Your Honor, permission to publish?
THE COURT: Proceed.
(Government Exhibit 23 played in open court.)
BY MR. PORTER:
Q. Whose voice is that?
A. Danny Montoya, Jr.
Q. And do you understand that to be a call on May 22nd of 2005

at approximately 12:20 a.m.?
A. Yes.
Q. Sir, do you have Government Exhibits 25 and 26 in front of you?
A. Yes.
Q. Have you listened to Government Exhibit 25 previously?
A. Yes.
Q. In listening to Government Exhibit 25, did you assist in the preparation of the transcript that's contained within Government Exhibit 26?
A. Yes.
Q. I will ask you more about that.
Who do you understand to be the speakers on the recording, Government Exhibit 25?
A. Mr. Zambrano and his son, Little Tino.
Q. Little Tino, by May of 2005 did you know who he was?
A. Yes.
Q. Had you had conversations with him?
A. Yes.
Q. Approximately how many?
A. 50.
Q. So you recognized his voice?
A. Yes.
Q. In May of 2005 did you have an understanding as to whether Mr. Zambrano's son held any rank within the Latin Kings?

A. Yes.
Q. What was your understanding?
A. He was the Inca of the Midways.
Q. Does Government Exhibit 26 contain to the best of your ability an accurate transcription of the words that were spoken on Government Exhibit 25?
A. Yes.
MR. PORTER: Your Honor, permission to publish Government Exhibit 25?
THE COURT: Proceed.
(Government Exhibit 25 played in open court.)
BY MR. PORTER:
Q. In May of 2005 you've testified about the bar Frankie and Johnny's, correct?
A. Yes.
Q. Where was it? Where was it located?
A. It's in Midway Latin King territory. I believe it's on Central. I'm not positive with the address.
Q. In May of 2005 did any particular Latin King chapter have responsibility for providing security at that bar?
A. The Midways.
Q. Whose members included Little Tino and Danny Montoya?
A. Yes.
Q. In May of 2005 was Rudy Rangel, Sr., a Latin King?
A. Yes.

Q. Had you provided security for him before?
A. Yes.
Q. Sir, do you know an individual named Mack?
A. Yes.
Q. Who do you know that individual to be?
A. A Saint.
Q. What's a Saint?
A. They are our prison allies. You know, Latin Kings have allies inside the prison institution.
Q. So he is a member of a gang called the Saints?
A. The Almighty Saints.
Q. By May of 2005 had you had conversations with Mr. Zambrano about Mack?
A. Yes.
Q. What had you and he discussed?
A. Well, we --
Q. I'm sorry. Before we get there, by May of 2005 how many conversations had you had with Mr. Zambrano concerning Mack?
A. Several. Maybe three or four.
Q. Was anyone else a participant in those conversations?
A. Mr. King.
Q. Anyone else?
A. No.
Q. Were you a participant or were you --
A. Yes, I was there.

Q. Okay. And what was discussed concerning Mack and the Saints?
A. Well, it really wasn't concerning Mack as an individual, it was concerning Mack as who he represented. He represented the Saints. And the Saints wanted permission to open up a neighborhood inside the Midway Latin King territory.
And nobody thought that was a good idea. Mr. Zambrano didn't. He didn't want that, you know. We didn't play well with others, you know.
It was Latin King territory, and that's the way it was going to stay. And Crown Town brothers wanted to go to war with the Saints over that. And Ace didn't want a war, Mr. King didn't want a war with the Saints.
Q. I'm going hand you what's been marked and admitted into evidence as Government Exhibits 31 through 34. And again, if I could trade with you the exhibits that you have up there.
Sir, as before, let's take a look at those and let us know when you have familiarized yourself with them.
A. Okay.
Q. Now, can you get Government Exhibits 31 and 32 in front of you?
A. I have them.
Q. They are a tandem?
A. Yes.
Q. A disk and a transcript?
A. Yes.

Q. Have you listened to Government Exhibit 31?
A. Yes.
Q. In listening to Government Exhibit 31, did you assist in the preparation of a transcript that's now contained in Government Exhibit 32?
A. Yes.
Q. Does Government Exhibit 32 accurately to the best of your ability transcribe the words that were spoken in Government Exhibit 31?
A. Yes.
Q. Who are the participants in this telephone call?
A. Mr. Zambrano and Danny Montoya, Sr.
Q. And now you've mentioned the Montoyas several times. Is this the son or the father?
A. This is the father.
Q. Okay. And it's the son who you identified as having some rank within the Midway Latin Kings?
A. Yes.

MR. PORTER: Your Honor, permission to publish?

THE COURT: Proceed.

BY MR. PORTER:

Q. And we are going to play, sir, Government Exhibit 31. So if you could follow along on Government Exhibit 32.

(Government Exhibit 31 played in open court.)

BY MR. PORTER:

Q. That call you understand occurred on May 28th of 2005 at approximately 3:12 p.m.?
A. Yes.
Q. Okay. Now, do you have Government Exhibits 33 and 34 before you?
A. Yes.
Q. Again, do those constitute a tandem of exhibits? One, the recording; one, the transcript?
A. Yes.
Q. Have you listened to Government Exhibit 33?
A. Yes.
Q. Does Government Exhibit 34, did you help to prepare that?
A. Yes.
Q. Does Government Exhibit 34 accurately, to the best of your ability, transcribe the words that were spoken on Government Exhibit 33?
A. Yes.
MR. PORTER: Your Honor, may we publish Government Exhibit 33?
THE COURT: Proceed.
(Government Exhibit 33 played in open court.)
BY MR. PORTER:
Q. Sir, do you understand that this call occurred on May 28th of 2005 at approximately 9:59 p.m.?
A. Yes.

Q. Same day as the call that we just listened to?
A. Yes.
Q. Now, on May 28th of 2005, Danny Montoya, Sr., did he have rank within the Latin Kings?
A. No.
Q. Did he outrank Mr. Zambrano?
A. No.
Q. Did Mr. Zambrano outrank him?
A. Yes.
Q. Sir, do you know a man named Cisco Bernal?
A. Yes.
Q. Who is he?
A. That's Cisco. He is our Nation Enforcer.
Q. Was he your Nation Enforcer in June of 2005?
A. Yes.
Q. As the Nation Enforcer, to whom did he report?
A. To the Supreme Inca, Mr. King.
Q. By June of 2005, had you known him?
A. Yes.
Q. How many times had you conversed with him by June of 2005?
A. Maybe 50 times.
Q. Recognize his voice?
A. Yes.
Q. By June of 2005 did you know Loks?
A. Yes.

Q. Did you know him by the name Anthony Compeon as well?
A. Yes.
Q. By June of 2005 how many times had you had conversations with Mr. Compeon?
A. Hundreds.
Q. In fact, did you also have a narcotics relationship with Mr. Compeon at times?
A. Yes.
Q. How was that?
A. I would supply him with kilos of cocaine, and he would supply me with kilos of cocaine.
Q. In much the same way that you discussed the -- Mr. Ceballos earlier today?
A. Exactly the same way, just not as much quantity.
Q. I'm going to hand you what's been marked as Government Exhibits 35, 36, 39, and 40, which have previously been received in evidence.
And again, I'd ask you to take a look at these and let me know when you have familiarized yourself with them.
And, sir, I'm going to take back from you Exhibits 31 through 34.
A. Okay.
Q. Turning first to Government Exhibits 35 and 36, have you listened to the recording contained within Government Exhibit 35 previously?

A. Yes.
Q. In doing that, did you assist in preparing a transcript of the words that were spoken on Government Exhibit 35?
A. Yes.
Q. Does Government Exhibit 36 contain as accurate as possible a transcription of the words that were spoken on Government Exhibit 35 as you can prepare?
A. Yes.
MR. PORTER: Your Honor, permission to publish at this time.
THE COURT: Proceed.
BY MR. PORTER:
Q. Sir, I'm going to have played for you Government Exhibit 35, if you can follow along on Government Exhibit 36.
(Government Exhibit 35 played in open court.)
BY MR. PORTER:
Q. And, sir, before we get more to that, do you have Government Exhibits 39 and 40 in front of you?
A. Yes.
Q. Is that the same sort of tandem we have been discussing for a while now?
A. Yes.
Q. A recording and a transcript?
A. Yes.
Q. Have you listened to Government Exhibit 39?

A. Yes.
Q. Did you assist in the preparation of a transcript that's contained in Government Exhibit 40?
A. Yes.
Q. Does Government Exhibit 40 accurately to the best of your ability transcribe the words that were spoken in Government Exhibit 39?
A. Yes.
MR. PORTER: Your Honor, may I publish?
THE COURT: Proceed.
BY MR. PORTER:
Q. And, sir, as before, we are going to play Government Exhibit 39, if you can follow along on Government Exhibit 40.
(Government Exhibit 39 played in open court.)
BY MR. PORTER:
Q. The recording we just played, do you understand that recording occurred on June 4th of 2005 at approximately 1:27 in the afternoon?
A. Yes.
Q. There is a -- who are the speakers in that recording that we just heard?
A. Loks and Mr. -- well, Anthony Compeon and Augustin Zambrano.
Q. And then there is a third individual, is that right?
A. Yes.
Q. He is identified as UM or, unidentified male, in the

transcript?
A. Yes.
Q. Do you, as you sit here today and listen to that, do you have an understanding as to who that is?
A. No.
Q. On page 3 of the conversation, at line 9 there is a reference to a Doughboy, do you see that?
A. Yes.
Q. Do you have an understanding as to who Doughboy is?
A. Yes.
Q. Who is Doughboy?
A. He is a Latin King.
Q. From where?
A. Little Village, 26th Street Region.
Q. In June of 2005 did he have rank?
A. No, not to the best of my ability. I don't remember.
Q. In the conversation that you listened to just previously, in Government Exhibit 35, do you recall the participants in that conversation?
A. Yes.
Q. Who were they?
A. It's Cisco and Mr. Zambrano.
Q. Now, in June of 2005 did you have conversations with Mr. Zambrano concerning Fernando King?
A. Yes.

Q. Specifically, did you all talk about Mr. King being arrested?
A. Yes.
Q. By whom was he arrested, if you know?
A. CPD.
Q. And approximately when was he arrested?
A. Sometime in June. I don't know the exact date.
Q. Sometime in early June of 2005?
A. Yes.
Q. All these conversations that we've listened to this morning and now this afternoon, were you a Latin King during all those time periods?
A. Yes.
Q. Okay. I want to move forward now, if we could, okay, until the time period when you identified yourself as cooperating with the federal government. Okay?
A. Okay.
Q. And when was that time period?
A. March 1st, 2006, to December 5th of 2006.
Q. During that time period were you still representing yourself as a Latin King?
A. Yes.
Q. Were you still representing yourself as a drug dealer?
A. Yes.

MR. PORTER: Your Honor, could I have a moment?

THE COURT: Yes.

A. Yes.
Q. What is it?
A. It's an audio and visual of me and Mr. King and several of Mr. -- Mr. Zambrano and somebody else.
Q. You've seen it before today?
A. Yes.
Q. Does it truly and accurately depict a meeting that you had with Mr. King, Mr. Zambrano, and others on or about December 4th of 2006?
A. Yes.
MR. PORTER: Your Honor, I would move into evidence Government Exhibit 68 at this time.
THE COURT: It is received.
(Government Exhibit 68 received in evidence.)
BY MR. PORTER:
Q. Government Exhibit 69, sir, do you have that in front of you?
A. Yes.
Q. Did you assist in its preparation?
A. Yes.
Q. What is it?
A. It's a transcript of 68 CD.
Q. Okay. Does it contain a true and accurate to the best of your ability transcription of the words that are said on Government Exhibit 68?
A. Yes.

MR. PORTER: Your Honor, I would move into evidence then Government Exhibit 69.

THE COURT: For limited purposes, it is received.

(Government Exhibit 69 received in evidence.)

MR. PORTER: And, your Honor, with your permission, I would ask to publish Government Exhibit 68?

THE COURT: Proceed.

MR. PORTER: Which is also in video form.

THE COURT: Video, audio?

MR. PORTER: Video and audio, yes.

THE COURT: Proceed.

(Government Exhibit 68 played in open court.)

BY MR. PORTER:

Q. Now, sir, have you just greeted the individual whose picture is on the still that's on the screen?

A. Yes.

Q. Who is that?

A. It's Doughboy.

Q. Have you identified him previously?

A. Yes.

Q. And who is Doughboy?

A. He is a member of the Latin Kings from the 26th Street Region.

(Government Exhibit 68 played in open court.)

BY MR. PORTER:

Q. Sir, were you watching the video there?
A. Yes.
Q. Okay. Did you shake Mr. King's hand?
A. Yes.
Q. Was there a particularly -- particular way that you did?
A. Yes.
Q. How was it?
A. Well, as members of the Latin Kings, when we greet each other we shake each other's hands. And, you know, I can only do it with somebody else, but, you know, you shake your hand and then you bang your fist across your heart.
Q. Why do you do that?
A. You know, it's -- that's the way we shake hands. That's our Nation salute. There is a meaning for that.
Q. What is the meaning of banging your heart?
A. Right fist upon our heart means that I will die for you, for you are flesh of my flesh, blood of my blood.
Q. Okay.

(Government Exhibit 68 played in open court.)

BY MR. PORTER:
Q. Do you recall that meeting, sir?
A. Yes.
Q. Did you provide Mr. King with anything during that meeting?
A. Yes.
Q. What did you provide him?

A. The kilo of cocaine that he asked for.
Q. As far as you know, was it an actual kilo or something else?
A. Yeah, it was something that was supposed -- I mean, I don't know exactly what it was. It was supposed to represent a kilo of cocaine.
Q. Was it packaged in such a way as to look like a kilo of cocaine?
A. Yes.
Q. Did you give it to anybody?
A. Yes.
Q. Who did you give it to?
A. I gave it to Mr. King.
Q. What did he do with it?
A. He put it in the towel and he stored it up in the upper pipes.
Q. Now, at some point in the conversation you had a conversation about Biggies, is that right?
A. Yes.
Q. I direct your attention to the third page of the transcript at lines 3 and 4. Are you there?
A. Yes.
MR. PORTER: I'm sorry. If I could have a moment?
THE COURT: Yes.
BY MR. PORTER:
Q. You used words to the effect of did you get ahold of Biggies.

Do you recall saying that?
A. Yes.
Q. Who were you addressing?
A. I was talking to Mr. Zambrano.
Q. And why were you asking whether Mr. Zambrano had gotten ahold of Biggies?
A. Because I had asked him to get ahold of Biggies for me.
Q. On -- and this conversation is on December 4th of 2006, is that right?
A. Yes.
Q. Biggies is the individual you previously identified as Danny Aguilar?
A. Yes.
Q. As of this date, on December 4th of 2006, did you still owe Biggies any money?
A. Yes.
Q. How much?
A. I don't remember if it was 19 or 20 thousand.
Q. You owed him for a kilo of cocaine?
A. Yes.
Q. Why were you raising that issue with Mr. Zambrano?
A. Because I had recently been trying -- I tried all day to get ahold of Biggie myself, and I couldn't. So I went to ask Mr. Zambrano to try to get ahold of him so that I can pay him -- I can pay Biggies their money.

Q. You said later, as referenced at page 3, line 23, I don't want no taxes or extra charges on me saying I wasn't trying to pay them back.

Do you recall saying that?

A. Yes.

Q. What were you referring to?

A. Because part of this -- part of this agreement amongst us drug dealers is when we say we are gonna take something, you have to pay it by that date.

And let's say I ask for 30 days, and it's day 35. Well now you are going to be taxed an extra thousand dollars.

Q. What did Mr. Zambrano or Mr. King have to do with that?

MR. GRAHAM: Objection. Compound.

I withdraw it.

THE COURT: You may answer.

BY THE WITNESS:

A. Well, again, the drug -- our drug business, this insurance policy, it all originated from Mr. King, Mr. Zambrano. And me and Biggies' deal, I'm under the same rules. I owe Biggie now. I'm the ower. You know, I'm subject to these same rules.

And I'm just letting them know, hey, I'm trying to pay my debt. So tomorrow they can't say well, you've owed me already, you are five days late.

Yeah, but I've been trying to get ahold of you for five days. So I didn't want to have to pay them extra money because

they didn't want to answer the phone.
Q. Did you understand that Biggies had the same sort of insurance policy that you had sought?
A. Yes.
Q. Later in that conversation Mr. King says words to the effect of, if you want to leave it here, that's straight.
Do you recall him saying words to that effect?
A. Yes.
Q. What was he referring to there?
A. If I wanted to leave the money with him that it was okay.
Q. The 19 or 20 thousand dollars that you owed to Biggies?
A. Correct.
Q. I want to go back to one clip that I think we may have sort of jumped over as we were playing the video. Mr. Diamantatos can queue that up.
Take a look at the monitor, sir.
(Government Exhibit 68 played in open court.)
BY MR. PORTER:
Q. We just saw a clip of what appeared to be you shaking hands with Mr. Zambrano?
A. Correct.
Q. Did you see that?
A. Yes.
Q. What were you and he doing?
A. Again, I was leaving so I was -- we are Latin Kings. When we

greet each other we shake hands, and when we leave each other's presence we shake hands.

Q. After this meeting on December 4th of 2006, did you have an understanding as to whether you had this insurance from Mr. King and Mr. Zambrano?

A. Yes.

Q. What was your understanding?

A. Well, I had already had the understanding when I gave them the $2,000. It was already locked in.

Q. Did this lock it in as well?

A. Yes.

Q. Sir, there were just two other recordings that I wanted to discuss with you today, okay?

I want to hand you what's been marked as Government Exhibits 60 and 61. Sir, take a look at those and let me know when you have familiarized yourself with them.

A. I'm ready.

Q. Sir, have you listened to Government Exhibit 60 previous to today?

A. Yes.

Q. What is it?

A. It's a CD, audio of my recording.

Q. Do you understand it to be a recording of a conversation you had with Fernando King on or about November 11th of 2006?

A. Yes.

Q. Does Government Exhibit 60 truly and accurately convey and depict a conversation that you had with Mr. King on that day?
A. Yes.
MR. PORTER: Your Honor, I would move into evidence Government Exhibit 60 at this time.
THE COURT: It is received.
(Government Exhibit 60 received in evidence.)
BY MR. PORTER:
Q. Sir, do you have Government Exhibit 61 in the front of you?
A. Yes.
Q. And what is that?
A. Transcripts.
Q. Okay. Did you help to prepare that transcript?
A. Yes.
Q. Does Government Exhibit 61 truly and accurately to the best of your ability transcribe the conversation that occurred on Government Exhibit 60?
A. Yes.
MR. PORTER: Your Honor, for purposes you've previously enunciated, I would move into evidence Government Exhibit 61.
THE COURT: It is received.
(Government Exhibit 61 received in evidence.)
MR. PORTER: With your permission, your Honor, we would publish Government Exhibit 60.
THE COURT: Proceed.

MR. PORTER: Which corresponds to Government Exhibit 61.

(Government Exhibit 60 played in open court.)

BY MR. PORTER:

Q. Now, sir, there was a fair amount of inaudible that wasn't picked up on the transcript, is that right?

A. Yes.

Q. Have you now heard words to the effect of like if Bam was telling?

A. Yes.

Q. We picked up at around that area?

A. Yes.

Q. Okay.

(Government Exhibit 60 played in open court.)

BY MR. PORTER:

Q. Sir, at the beginning of that conversation you asked Mr. King whether he had heard what happened with a couple of the guys going away. Do you recall asking him that?

A. Yes.

Q. And then you said words to the effect of, they didn't tell you a couple of the guys got picked up?

A. Yes.

Q. How did he respond?

A. He said A-Town and them.

Q. Who is A-Town?

A. A-Town is the Inca of the Aurora Latin Kings.

Q. And what are you and he discussing?
A. Well, quite a few of the Aurora Latin Kings, they just got picked up.
Q. They got arrested?
A. Yes.
Q. At the bottom of that page Mr. King says words to the effect of they got a few indictments coming down by the end of the year, my lawyer told me. And then he continues, he said the majority of them are Latin Kings though.
Do you recall him saying those words?
A. Yes.
Q. Now, this conversation was when?
A. November 7th.
Q. Of what year?
A. 2006.
Q. And do you understand that less than a month later several Latin Kings were arrested by federal authorities?
A. Yes.
Q. Mr. King also said words to the effect of, at the bottom of page 1, yeah, people telling -- people jacking motherfuckers, we're killing motherfuckers that jack sons of bitches. We ain't tolerating that.
And then he continues, we're gonna get you. I'm the one to tell you that we ain't up with all that.
Do you recall him saying those words?

A. Yes.
Q. Do you have an understanding as to what he is referring to there?
A. Yes.
Q. What's he referring to there?
A. Well, I thought he was referring to me.
Q. To you?
A. Yes.
Q. Why is that?
A. Well, because prior to this date I had paid Jacob, which is a Latin King, for the kilo of cocaine that I received from Danny, the ATF had me pay to him and Jacob came and picked up the money.

And as when he left my house, sometime shortly after the ATF pulled him over and took his money.

Well, Jacob thought that I really robbed him. He didn't think that they really the government -- he didn't think they were real. He thought they were fake agents. And he was upset. And he went crying to Biggies and Biggies crying to Ace saying Chuy robbed us for 20 Gs.
Q. And that -- when you say Jacob, who is that?
A. He is the Inca of the Harlem 62nd Latin Kings.
Q. Was he a partner in Danny Aguilar's drug business?
A. That was his only part- -- that was his partner.
Q. And why did you take this to be a reference to you? What was it that Mr. King said that you thought was a reference to you?

A. Well, when he said -- I had found out when he said the words jacking motherfuckers. Jacob is married to my cousin, he has children with my female cousin. And she is the one -- that's how I found out. Because he went complaining to her and he really thought that I robbed him, you know, and it got back to me.

Q. When Mr. King was saying we and we're, we're gonna get you, was the we a reference to the Latin Kings?

A.. Yes.

MR. PORTER: Your Honor, could I have a brief sidebar?

THE COURT: Yes.

(Proceedings heard at sidebar:)

THE COURT: Yes.

MR. PORTER: I'm sorry. I just wanted to advise you, just in terms of sort of schedule, we have got one recording left. It's about -- it's a long recording. It's about 35 or 40 minutes, if you wanted to take a break, if you wanted to just keep pressing on, or whatever. It's going to go for a while.

So I just want to keep you apprised of that. And I'm sorry to interrupt. And then we are going to be done.

THE COURT: All right. Can you use up five or six minutes here?

MR. PORTER: Not easily, Judge. It's either we're in for about 35 or --

THE COURT: Not at all.

MR. PORTER: -- not at all, yeah.

THE COURT: All right. Now, wasn't Montoya the toreador in the Sun Also Rises?

MR. BAUMGART: Um-hum.

THE COURT: I knew Mr. Baumgart would pick up on that. All right. So we will end for the day.

He was a great toreador.

(Proceedings heard in open court:)

THE COURT: Members of the jury, there is one long recording that we will begin with tomorrow, rather than interrupt it along the way. It would be better to start fresh.

And you have been listening for a long time during the course of the day. And so you are excused until tomorrow morning, once again, at 10:00 o'clock. We will pick up with the same witness and a new tape.

Counsel, please remain.

(Jury out.)

THE COURT: How much more time do you think, Mr. Porter, that you will need with this witness on direct?

MR. PORTER: Approximately 45 minutes. I think no more than that. It's playing the recording, asking a few questions.

THE COURT: All right. So that might take you roughly to at or near noon, assuming we start a couple minutes late tomorrow.

All right. So defense counsel should be ready to cross examine with this witness tomorrow afternoon.

MR. GRAHAM: Yes, Judge.

THE COURT: All right. Thank you, counsel.

Court is adjourned.

MR. PORTER: And, Judge, what time should we come up tomorrow?

THE COURT: 10:00 o'clock.

MR. PORTER: 10:00 o'clock. Okay.

THE COURT: I don't know if I mentioned that to the jury, but I think by now there is some consistency with what we are doing here.

All right.

(Proceedings adjourned at 4:00 p.m. to 10:00 a.m.)

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA, )
)
Plaintiff, )
) No. 08 CR 746
vs. ) Chicago, Illinois
) March 8, 2011
AUGUSTIN ZAMBRANO, VICENTE ) 10:00 a.m.
GARCIA, ALFONSO CHAVEZ and )
JOSE GUZMAN, )
)
Defendants. )

VOLUME 7
TRANSCRIPT OF PROCEEDINGS - TRIAL
BEFORE THE HONORABLE CHARLES R. NORGLE, SR.

APPEARANCES:

For the Plaintiff: HONORABLE PATRICK J. FITZGERALD
United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
BY: MR. ANDREW C. PORTER
MS. NANCY L. DE PODESTA
MR. TINOS DIAMANTATOS

For Defendant Zambrano: LAW OFFICES OF JAMES A. GRAHAM
53 West Jackson Boulevard
Suite 703
Chicago, Illinois 60604
BY: MR. JAMES A. GRAHAM

Official Court Reporter: MAELLEN E. PITTMAN, FCRR, RDR
219 South Dearborn Street
Room 2342
Chicago, Illinois 60604
Maellen_Pittman@ilnd.uscourts.gov

APPEARANCES: (Continued)

For Defendant Garcia: BAUMGART & ASSOCIATES
39 South LaSalle Street
Suite 600
Chicago, Illinois 60603
BY: MR. FRANCIS BAUMGART

For Defendant Chavez: DOMINGO F. VARGAS & ASSOCIATES, LTD.
734 North Wells Street
Chicago, Illinois 60610
BY: MR. DOMINGO F. VARGAS

For Defendant Guzman: LAW OFFICE OF NISHAY K. SANAN
327 South Plymouth Court
Chicago, Illinois 60604
BY: MR. NISHAY K. SANAN
MR. STEPHEN F. HALL

INDEX


| WITNESS: | PAGE: |
|---|---|
| JESSE GUAJARDO | |
| Direct Examination by Mr. Porter (Resumed) | 1032 |
| Cross Examination by Mr. Graham | 1059 |
| Cross Examination by Mr. Baumgart | 1133 |
| Cross Examination by Mr. Vargas | 1133 |
| Voir Dire Examination by Mr. Sanan | 1141 |
| Cross Examination by Mr. Sanan | 1145 |
| Redirect Examination by Mr. Porter | 1153 |
| Recross Examination by Mr. Graham | 1162 |
| Recross Examination by Mr. Vargas | 1162 |
| ERNESTO GRIMALDO | |
| Direct Examination by Mr. Diamantatos | 1163 |


GOVERNMENT EXHIBITS


| | PAGE: |
|---|---|
| 56 | 1040 |
| 57 | 1041 |
| 42 and 44 | 1199 |

(Proceedings heard in open court:)

THE COURT: The jurors will be in shortly.

(Jury in.)

THE COURT: Good morning, members of the jury.

Mr. Porter, you may proceed.

MR. PORTER: Thank you, your Honor.

JESSE GUAJARDO, PLAINTIFF'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (Resumed)

BY MR. PORTER:

Q. Sir, good morning.
A. Good morning.
Q. We are on the home stretch, okay?

A couple of things before we get to the last recording that I wanted to discuss with you.

I want to show you what has been marked and previously admitted into evidence as Government Exhibit 283. Okay?

And, sir, is there also a copy of that photo on the screen in front of you?
A. Yes.
Q. Okay. Do you recognize those three individuals?
A. Yes.
Q. Who are they?
A. Mr. Zambrano is the black shirt with glasses, Mr. King is in the gold shirt, and the lady is Barbara, Mr. Zambrano's wife.
Q. That's the woman that you've talked about a little bit?

A. Yes.
Q. Do you have a sense of when this picture was -- is there a time stamp on the picture?
MR. GRAHAM: Judge, I'm going to object. The exhibit speaks for itself, if there is a time stamp on it.
THE COURT: Well, you may answer the last question.
BY MR. PORTER:
Q. Is there a time stamp on the picture?
A. Yes.
Q. When is it?
A. November '06 -- no, November 6th of '04.
Q. And what are the colors of Mr. King's apparel?
A. He it is wearing black and gold.
Q. You can put that aside.
Sir, did you have occasion to talk to Mr. King about the issue of maps?
A. Yes.
Q. When was that?
A. I want to say late '04, maybe early '05.
Q. Where was that?
A. At his home.
Q. Do you remember, do you have the day in mind?
A. Well, I know it was a Sunday.
Q. How do you know that?
A. Well, the only reason I went to his house is because I had

bought him -- I had bought him a big lion head statue at a flea market, and I only went to the flea market on Sundays. And actually I was at the flea market with me and some of the King brothers. And he had previously seen the one I had in my home, and he said, man, I'd like to buy that from you.

So when I'm walking around shopping, I see one. So I called him, like, hey, you really want a lion head?

He's like, yeah, yeah.

I was like, I'm gonna buy it, but you're, you know -- I'm gonna buy it for you, but you're gonna pay me back.

He said, yeah, buy it. Bring -- you know, buy it, bring it to me today.

So I bought it early into the day. I'd say about 8:00 o'clock at night, 9:00 o'clock at night, me and the same King brothers went to drop off his gift.

And we get up there, he's up there in his room, him and Loks. And I was like, here you go, give him his gift.

He's like, oh, thank you. He's like, sit down.

I was like, what are you doing.

He had these color pencils and color crayons. We are gang members, we make fun of each other. We're like, what you are you doing, coloring?

He's like, I'm not coloring. And my associates start picking on him, like, man, we caught the Supreme Inca coloring, you know.

Q. Who was -- you said Mr. King was present and yourself?
A. Yes.
Q. Who else do you recall being present that Sunday evening?
A. Yes. Well, who went with me was Maise, Anthony Zizzo, and Z, Zef Racy, that's who accompanied me. But Loks was there, Mr. Compeon was with him when we went in there.
Q. So you began this discussion regarding maps.
A. Yes.
Q. How was it that any of this had to do with maps?
A. Well, like I said, we started making fun of him 'cause we said, you're coloring.

And he is like, I'm not coloring, you know.

And we are -- again, we are just joking with him.

He was again, no, I want to draw a map -- I want to draw a map of Little Village, the Hood.

I'm like, what do you mean, you are going to draw a map?

Yeah, I want to get ahold of one of them Chicago maps that show all the streets, you know, and then I'll take off of that what I need.

So one my King brother, Z, was like, man, you don't need a map from Chicago. I could do it.

And, you know, then it became a challenge. And Z got on the floor 'cause they had the table, a little table, and he starts drawing the blocks. And Loks is sitting on the couch, and he is smoking.

CERTIFICATE OF SERVICE

I certify that I have placed a copy of this Memorandum in Support of Petitioner's Motion to Vacate, Correct, Set Aside, Judgement, and Conviction in a sealed envelope, with postage pre-paid, for delivery by the United States Postal Service, to the United States District Court for the Northern District of Illinois 60604, and an additional copy to the United States Attorney's office at the address as shown below, on this 11th day of January, 2016.

UNITED STATES ATTORNEY OFFICE
FOR THE NORTHERN DISTRICT OF ILLINOIS
219 South Dearborn Street, 5th Floor
Chicago,Illinois 60604

Vicente Garcia
VICENTE GARCIA

BY MR. PORTER:

Q. Sir, during the fall of 2006 did you record a series of conversations with Fernando King?

A. Yes.

Q. I want to show you what's been marked as Government Exhibit 58 and 59, okay?

A. Okay.

Q. And again, I'm going to take back what you have in front of you. Same drill if we could, sir. Familiarize yourself with what we have handed you and let me know when you are done?

A. I'm ready.

Q. Let's turn to Government Exhibit 58 first. Is that a recording?

A. Yes.

Q. Have you listened to it?

A. Yes.

Q. Does that contain a conversation between you and Fernando King on or about October 15th of 2006?

A. Yes.

Q. And does that -- does the recording in Government Exhibit 58 truly and accurately record the conversation or parts of a conversation that you had with Fernando King on that day?

A. Yes.

MR. PORTER: Your Honor, I would move into evidence Government Exhibit 58 at this time.

THE COURT: That is the disk?
MR. PORTER: That's the disk, yes.
THE COURT: It is received.
(Government Exhibit 58 received in evidence.)
BY MR. PORTER:
Q. Sir, before we get further into that, do you have Government Exhibit 59 before you?
A. Yes.
Q. What is it?
A. A transcript.
Q. Did you assist in its preparation?
A. Yes.
Q. Does Government Exhibit 59 truly and accurately to the best of your ability transcribe portions of the conversation that are contained within Government Exhibit 58?
A. Yes.
MR. PORTER: Your Honor, for purposes of assisting the jury we would move Government Exhibit 59 into evidence.
THE COURT: It is received for the limited purpose previously indicated.
(Government Exhibit 59 received in evidence.)
MR. PORTER: Your Honor, permission to publish?
THE COURT: Proceed.
BY MR. PORTER:
Q. Sir, I'm going to play you Government Exhibit 58. If you can

follow along in Government Exhibit 59.

(Government Exhibit 58 played in open court.)

BY MR. PORTER:

Q. Do you recall that conversation, sir?

A. Yes.

Q. In general terms, what were you and Mr. King discussing?

A. An insurance -- an insurance policy to allow me to distribute my cocaine amongst Latin Kings, that they would pay me back, you know, regardless of what happens.

Q. Why would you need an insurance policy?

A. 'Cause as us being Latin Kings, we tend not to pay each other. We come up with excuses.

Q. So what were you proposing?

A. That I would pay Mr. King a certain percentage of my sales of the cocaine.

Q. In exchange for what?

A. That the Nation would back me; that they would -- you know, if I sold drugs that it was supported by the Nation, and now it's Nation money, it's not just my money.

At first it's just my money. So you don't get paid, I'm the only one that don't get paid.

Now if the Nation is backing me, now it's Nation money. You have to pay that money. There is no excuses.

Q. Now, at the beginning of that conversation it's referenced on page 1, approximately line 6, you say to Mr. King: Trouble hurt

me.

Do you see that?

A. Yes.

Q. What were you referring to?

A. To Mr. Ramon Ceballos.

Q. That's the situation you testified about earlier today?

A. Yes.

Q. And then you said a little further down, I don't want to get fucked by the brothers, bro'.

Do you recall saying that?

A. Yes.

Q. What were you referring to?

A. Well, again, when the King brothers don't pay, they will come up with an excuse for not paying for the narcotics. It has to be paid. Somebody has got to pay it. So I have to pay it.

Q. And then you said I had talked to Loks about this a while ago. He said you got to pay the Nation, or words to that effect.

Who was Loks?

A. Loks is the Regional Inca for 26th Street.

Q. That is Anthony Compeon who we discussed?

A. Yes. Mr. Compeon.

Q. What were you referring -- what conversation were you referring to there?

A. Well, before this date me and Loks were in the bar just, you know, hanging out, having a few drinks and --

MR. GRAHAM: Judge, could I have a foundation on this?

THE COURT: Sustained.

BY MR. PORTER:

Q. When did this conversation occur?

A. Late '05.

Q. Before the point that you began cooperating?

A. Yes.

Q. And where did this conversation occur?

A. In my -- in our bar, Jackie's.

Q. You said in my bar, our bar. Why did you refer to Jackie's in that way?

A. Just a Latin King bar. That's where -- again, it's in our area, it's in our territory. Just a habit of saying that it's ours.

Q. Is it in Summit?

A. Yes.

Q. Was anyone else present other than you and Mr. Compeon for this conversation?

A. No. The conversation was just between me and him. I was complaining.

Q. Complaining about Trouble?

A. Yes.

Q. What did Loks tell you?

A. He actually laughed at me, you know. You know, we were friends. We were just joking. He laughed at me. And he said

that --

MR. GRAHAM: Judge, I'd object to the hearsay nature of this.

THE COURT: Overruled.

BY THE WITNESS:

A. He was -- you know, we joke with each other. We pick on each other. And he thought it was funny that I didn't get paid.

And he was like, look, you know. Why don't you just pay the Nation.

I was like, what do you mean, pay the Nation?

He was like, yeah, pay the Nation.

He was like, how much does he owe you?

And I told him, bro', he owes me over a hundred grand. Me personally a hundred grand.

He was like, okay, so you lost it, right?

And I was like, yeah, it's done. I'm not getting that money back. It's over with. It's gone.

He is like, okay, you pay the Nation. Maybe you get half back maybe, you get more back. He goes I can't tell you what you're gonna get, but it's better than losing it all.

That's where I got the idea of paying the Nation.

BY MR. PORTER:

Q. Now, Mr. King at some point -- and it's referenced on page 2, lines 27 and 28 of the transcript -- says words to the effect of yeah, that's what a lot of people should have done. That's what

Mouse should have done. That what everybody should have done.
Do you recall him saying those words?
A. Yes.
Q. What did you understand him to be referring to?
A. Well, Mouse is a Latin King but he is also an Inca. He was a Trumbull Inca. I don't remember for -- there is quite a few Trumball hoods.
Q. That in the 26th Street Region?
A. Yes.
And Mouse of course had a debt owed to him for narcotics and they didn't pay him. And Mouse never got paid for it.
And, you know, I knew about it. Ace knew that I knew about it. And he was just referring to yeah, if Mouse would have paid the Nation he would have got his money, it's Nation money. Now you have to pay it.
Fraud → But since it wasn't Nation money, guess what, you don't have to pay it.
Q. Now, did -- how did Mr. King respond to your offer on October 15th of 2006?
A. He told me that he would go talk to the Viejo and get back with me.
Q. He didn't say no, he didn't say yes, he said I'll get back to you?
A. Correct.
Q. Now, at some point -- and it's referenced on page 3, line 27

of the transcript, Mr. King says words to effect of, I'll talk to Carnel tomorrow.

Do you recall him saying that?

A. Yes.

Q. Do you have an understanding as to who he was referring to?

A. Talking about Mr. Zambrano.

Q. Then Mr. King said I'll sit down with him, you know.

Do you recall him saying that?

A. Yes.

Q. Again, who was he referring to?

A. Again, he is talking about Mr. Zambrano.

Q. And then in the next line Mr. King said words to the effect of so somewhere down the line, if I'm doing something and he don't feel like he's left out, and he feels like he didn't know nothing, you know. He don't like that.

Do you have an understanding as to who he is referring to there?

A. Mr. Zambrano.

Q. Now, at some point in that conversation you offered to have Mr. King and Mr. Zambrano come to your house, correct?

A. Correct.

Q. Did you say words to the effect of holler at the Viejo if you want to sit down in my house, it's always open, bro'?

A. Yes.

Q. What were you talking about there?

A. Well, I had my own -- I had my own place, and that if they wanted to sit down and discuss this proposition, that we could use my home.
Q. How did he -- how did Mr. King respond to that?
A. He told me no, we don't do that. That's not how -- we don't sit down with the Viejo. It doesn't work that way.
Q. What did he tell you he was going to do?
A. He would go back to talk to him personally.
Q. In fact, he said I'll sit down with the Viejo and I'll get back with you, is that correct?
A. Correct.
Q. Reference to Viejo there is to who?
A. To Mr. Zambrano.
Q. Did you have subsequent conversations with Mr. King about this insurance issue?
A. Yes.
Q. I want to hand you what's been marked as Government Exhibits 62 and 63, if I could. And I will take back from you that which you have.
A. Okay.
Q. Have you reviewed those two exhibits?
A. Yes.
Q. Do you have Government Exhibit 62 in front of you?
A. Yes.
Q. Is that a recording?

A. Yes.
Q. Have you listened to that recording previously?
A. Yes.
Q. And is that a recording of a conversation that you participated in on or about November 21st of 2006?
A. Yes.
Q. Does Government Exhibit 62 truly and accurately depict a conversation that you participated in on that day?
A. Yes.

MR. PORTER: Your Honor, I would move into evidence Government Exhibit 62.

THE COURT: It is received.

(Government Exhibit 62 received in evidence.)

BY MR. PORTER:
Q. Sir, do you have Government Exhibit 63 in front of you?
A. Yes.
Q. What is it?
A. Transcripts.
Q. Is it a transcript that you helped to prepare?
A. Yes.
Q. What does it transcribe?
A. The conversation between me and Mr. King.
Q. A conversation that is contained within Government Exhibit 62?
A. Yes.

Q. Did you help to create Government Exhibit 63?
A. Yes.
Q. Does Government Exhibit 63 truly and accurately to the best of your ability transcribe the conversation that's contained on Government Exhibit 62?
A. Yes.

MR. PORTER: Your Honor, for the limited purposes of aiding the jury, we would move into evidence Government Exhibit 63.

THE COURT: Proceed.

(Government Exhibit 63 received in evidence.)

BY MR. PORTER:
Q. And with the Court's permission, I would play, sir, Government's 62 for you. If you can follow along, I'll ask you some questions after we have played it, okay?

(Government Exhibit 62 played in open court.)

BY MR. PORTER:
Q. Do you recall that conversation?
A. Yes.
Q. And this is the conversation that you have on this issue with Mr. King following the October 15th conversation?
A. Yes.
Q. Who brings up the issue this time?
A. Mr. King does.
Q. What does he say?

A. He said remember that one time you mentioned that other stuff.

Q. And then you responded. And then how did he respond?

A. He said yeah, the Viejo, the Viejo said like this, bro', anything has to come up front. We don't want to wait for you to get screwed or for someone to owe you.

Q. When Mr. King referred to the Viejo, who did you understand him to be referring to?

A. Mr. Zambrano.

Q. And when he said to you we don't wait for you to get screwed, who did you understand him to be referring to?

A. He is referring to me. He is referring to me not getting paid.

Q. When he uses the term we, we don't wait, when he says we, who is he referred to?

A. He is referring to himself and Mr. Zambrano.

Q. Did you understand him to be accepting this insurance offer?

A. Yes.

Q. What was he proposing to you?

A. Well, he was accepting it, but he wanted a whole kilo of cocaine from my shipment of 10 of them.

Q. Where in the recording can you point to that discusses that issue?

A. On page 3, line 18.

Q. Line 18 you say: What do you guys want? A month? Or, I

mean, by shipment? Or how did you decide? I got my hands on 10 of them right now, bro'. I just started.

What are you saying there?

A. I'm letting Mr. King know that I got my hands on 10 kilos of cocaine.

Q. Just stepping back for a moment, on that day in that conversation did you have possession of 10 kilos of cocaine?

A. No, I did not.

Q. Playing a role?

A. Yes.

Q. How did Mr. King respond to your statement?

A. He said 10, send us one off the top for me and the Viejo.

Q. Again, when he said me and the Viejo, who did you understand him to be referring to?

A. Mr. Zambrano.

Q. Sir, is it fair to say that every time he uses the term the Viejo or Viejo in this recording, you understood him to be referring to Mr. Zambrano?

A. Yes.

Q. Now, you testified a minute ago that you understood he wanted a kilo of cocaine. Does he use those words?

A. No.

Q. What does he say?

A. Just says send us one off top.

Q. And then how did you respond to that?

A. Well, I asked him does he want it like that or does he want it in paper.
Q. What does paper mean?
A. Money, you know. The code -- it's a nickname, you know, street slang for money.
Q. Okay. He responds it doesn't matter. Cocaine or money?
A. Correct. He says it doesn't matter.
Q. And then later on in that -- on that as referenced on that page, Mr. King says words to the effect of, you know, in this way you can guarantee that our word is behind you on that.
Do you recall him saying that?
A. Yes.
Q. When he said our word, who did you understand him to be referring to?
A. Mr. King and Mr. Zambrano.
Q. And did you take that to mean just the two of them personally, or on behalf of the Latin Kings?
A. On behalf of the Latin Kings.
Q. I want to back up just a little bit in the call -- or, I'm sorry, in the meeting.
And it's referenced in page 2 at the beginning at around line 16. Mr. King says words to the effect of right now dude from 26th Street, that help's gone. I have no more help. Immigration, all that's going on. My whole business, awe. The borderlines, ain't no pisas coming over here. And then he goes

on.

Do you have an understanding as to what he is referring to there?

A. Yes.

Q. What is he referring to?

A. He is referring to the Mika business.

Q. And what is Mr. King relating to you about what's going on with the Mika business?

A. It's temporarily shut down. There isn't actual business going on right now.

Q. And then he says, as referenced at lines 27 and onward, you know, I had to count on that, I would have given the Viejo at least an extra 2000 a month from what we get and he wouldn't be hurting like that.

Do you recall him saying that?

A. Yes.

Q. When Mr. King said you know, I had to count on that, what was he referring to there?

A. He is referring to, again, the sales of the Mikas. The percentage that the Latin Kings get every month.

Q. -- there is a discussion later on in the recording about a location called El Plan, do you recall that?

A. Yes

Q. What's El Plan?

A. It's another Latin King bar.

Q. That's one of the bars you have identified previously?
A. Yes.
Q. Where is it located?
A. It's in Crown Town. I believe on 55th, but I don't recall the street.
Q. Crown Town, the area loosely close to Midway Airport?
A. Yes.
Q. Crown Town is the Latin King's name for that area, is that right?
A. Yeah. The regional name.
Q. Okay. The discussion about El Plan, do you have an understanding as to what he is referring to there?
A. Yes.
Q. What's he referring to?
A. That another Latin King owes the owner of El Plan 17 grand. But what the Latin King doesn't realize is that Mr. King and Mr. Zambrano, you know, have business in that bar, you know. They are co-owners. Or, you know, to the best of my understanding is you owe the owner, you owe us.

And that King brother didn't know that. He is thinking he just owes a civilian. But the King brother finds out.
Q. Is this the same sort of insurance that you were seeking?
A. Yes.
Q. There is also a discussion between you and Mr. King concerning an individual you identify as Biggies. Do you recall

that?
A. Yes.
Q. It's referenced beginning at the bottom of page 5 of the transcript, is that right?
A. Yes.
Q. But before we get there, the first reference to Biggies is at the top of page 5 of the transcript, around line 6, is that right?
A. Correct.
Q. Who is Biggies?
A. He is a Regional Enforcer for the southwest region.
Q. He is a Latin King?
A. Yes.
Q. And did you have narcotics dealings with him?
A. Yes.
Q. What kind?
A. The same relationship I had with Trouble, the same relationship I had the Loks, I shared with Biggies.
Q. You supply him, he supply you?
A. Yes.
Q. Now, Mr. King relates to you words to the effect of I did the same thing to -- the same thing to fucking my boy, my own boy Little L from Spaulding who owed Biggies.
Do you recall him saying those words?
A. Yes.

Q. What did you understand him to be referring to there?
A. Well, Little L owed Biggies money for drugs, for cocaine. And Little L wasn't going to pay him back. But he didn't realize that Biggies had the same policy that quite a few of us had. And Little L had to pay the money back.
But what makes Little L so special he is an actual Spaulding 23rd, and that happens to be, you know, where Ace comes from.
And if Little L pays, you can best believe everybody is going to pay if I'm making my own boys pay.
Q. When you say the same policy, you mean the same policy that you were seeking?
A. Yes.
Q. At the bottom of page 5 and then going into page 6, you and Mr. King have further discussions about Biggies, is that right?
A. Yes.
Q. In general terms what are you and he discussing there?
A. I own -- I owe Biggies money for drugs right now. I owe --
Q. I'm sorry. Could you -- I didn't hear that.
A. I owe Biggies right now on this day, I owe him -- I don't remember if it was 20,000 or 19,000, I'm not sure with the amount. But I owe him for a kilo of cocaine. And, you know, I ain't been able to pay him.
Q. And you say to Mr. King Biggies wants his money now, is that right?

A. Can you tell me the line?
Q. Yeah. Approximately line 6 and 7 of page 6.
A. Yes.
Q. The cocaine that you owed Biggies for, was that cocaine that you had obtained while cooperating with ATF?
A. Yes.
Q. And you say I hope not. I hope he's not gonna tell me I owe him for that.
Do you see that?
A. Yes.
Q. What are you referring to there?
A. I'm referring to when -- I owed him for two kilos. And the ATF let me pay for one only.
And after I paid for that one kilo of cocaine, the ATF pulled over the individual that I paid and they took the money, you know. And as far as I was concerned, I already paid him, you know. Yet he got pulled over and lost the money but that wasn't my fault.
So I was -- I was letting the Supreme Inca know, hey, I'm not going to pay him twice.
Q. How did Mr. King respond to your discussion about Biggies?
A. He said he asked him about that, you know, but Biggies kind of just brushed it off.
Q. The conversation begins to wind down, as reflected on the bottom of page 6, when you say words to the effect of if you want

paper I'll give you the paper. If you want trabajo, I'll give you the trabajo.
Do you recall saying that?
A. Yes.
Q. What were you saying to Mr. King there?
A. I was letting him know he had options. If he wanted trabajo that means the actual product, the cocaine. And if he wants the paper, that means money. Or would he rather have the money.
Q. So on this date, on November 21st of 2006, what was the -- your understanding of whether you had reached a deal with Mr. King and Mr. Zambrano?
A. That I would have to supply them with at least a kilo of cocaine.
Q. In return for what?
A. In return for the protection of the insurance.
MR. PORTER: Judge, I can keeping going forward or we can take a break.
THE COURT: Well, since it's almost 2:30, it would be a good time to stop for a few minutes.
Members of the jury, you are excused.
(Jury out.)
THE COURT: That 2:00 o'clock rumor didn't work out.
MR. PORTER: We are all right, Judge.
(Recess.)
THE COURT: You may proceed, Mr. Porter.

MR. PORTER: Thank you, your Honor.

And before I do, the parties I believe had a stipulation that I think I neglected to read.

THE COURT: All right. You may read the stipulation to the jury.

MR. PORTER: Thank you.

The parties, the United States of America by Patrick Fitzgerald, defendants Augustin Zambrano through his counsel, James Graham, Vicente Garcia through Francis Baumgart, Jose Guzman through his counsel Nishay Sanan and Steve Hall, and Alfonso Chavez through counsel Domingo Vargas, stipulate and agree as follows:

Evidence has been received in this trial indicating that Defendant Zambrano and other individuals were previously incarcerated. This evidence was received for the purpose of establishing Defendant Zambrano's and other individual's whereabouts during the period of time referenced in order to give context to other evidence received in this trial.

It should not be considered for any other purpose.

So stipulated?

MR. GRAHAM: So stipulated.

MR. BAUMGART: So stipulated.

MR. VARGAS: So stipulated.

MR. SANAN: So stipulated.

THE COURT: Proceed.

BY MR. PORTER:
Q. Mr. Guajardo, before we move onto the next exhibit I just wanted to make sure that we were clear.
You said to Mr. King words to the effect of if you want paper, I'll give you the paper. If you want trabajo, I'll give you the trabajo.
Do you recall saying those words?
A. Yes.
Q. When you used the term paper, what were you referring to?
A. To money.
Q. When you used the word trabajo, what were you referring to?
A. Cocaine.
Q. Does trabajo mean cocaine in Spanish?
A. No. It actually means work.
Q. Okay. So it was code upon code?
A. Yes.
Q. Okay. When you left your meeting with Mr. King on November 21st of 2006, in your view did you have an agreement in place?
A. Yes.
Q. Did you meet with Mr. King again?
A. Yes.
Q. Did you meet with him approximately four days later?
A. Yes.
Q. Was that meeting recorded?
A. Yes.

Q. Sir, in your absence I think I replaced -- and you should have in front of you -- Government Exhibits 64 and 65.

Do you have those in front of you?

A. Yes.

Q. Can you take a minute to take a look at both of those exhibits?

A. I'm ready.

Q. Start with Government Exhibit 64. Is that a recording?

A. Yes.

Q. Have you listened to that recording previous to today?

A. Yes.

Q. And does that recording contain a conversation involving you and Mr. King and at various times Mr. Zambrano?

A. Yes.

Q. Does Government Exhibit 64 truly and accurately contain recordings of a conversation that you had on November 25th of 2006?

A. Yes.

MR. PORTER: Your Honor, I would move into evidence Government Exhibit 64 at this time.

THE COURT: It is received.

(Government Exhibit 64 received in evidence.)

BY MR. PORTER:

Q. In conjunction with listening to Government Exhibit 64, did you assist in the preparation of a transcript?

A. Yes.
Q. Is that what Government Exhibit 65 is?
A. Yes.
Q. Okay. Do you have that in front of you?
A. Yes.
Q. Did you help to prepare that?
A. Yes.
Q. Does Government Exhibit 65 truly and accurately portray to the best of your ability conversation that's contained on Government Exhibit 64?
A. Yes.

MR. PORTER: Your Honor, again, for the limited purpose for which it's offered, we would offer into evidence Government Exhibit 65.

THE COURT: It is received. You may proceed.

(Government Exhibit 65 received in evidence.)

MR. PORTER: Thank you, your Honor.

And with your permission we would play Government Exhibit 64.

Mr. Guajardo, please follow along with Government Exhibit 65.

THE COURT: Proceed.

(Government Exhibit 64 played in open court.)

BY MR. PORTER:

Q. During this meeting where did you meet?

A. At the taqueria, Pisanos Taqueria.
Q. What's that?
A. That's the restaurant that Mr. King and Mr. Zambrano owned.
Q. In general terms, what are you and Mr. King discussing that day?
A. I -- I couldn't give him the one whole kilo, and I was explaining to him why I couldn't. And I was explaining to him that I would rather pay him per kilo, instead of just giving him one whole one off the top.
Q. You explained to him why you couldn't give him just a kilo of cocaine off the top?
A. Correct.
Q. What did you say? Why couldn't you?
A. Because it didn't make no sense. If I'm only getting 10 -- if someone gives me 10 kilos, I have to pay for all 10 of those. And if I give one away, I still have to pay for that tenth one.
So now if I give him the tenth one for free, I'm still responsible for that. And that would be all the profit.
So it doesn't -- doesn't -- it doesn't -- it's not a good drug deal. It's not a good business deal for me to get 10 kilos from point A and I give one of them away. What did I do it for?
Q. But why did you care?
A. I didn't care. It was something that the agents brung up

with me. They didn't think that it -- they asked me: Hey, what do you think about this deal? Do you think this is a legitimate deal.

I told them well, personally, no. Because it doesn't make sense.

They thought Mr. King was actually just testing me to see what I would say. They asked me my advice and I told them. It's not a good deal.

Q. What did you propose?

A. To pay per kilo.

Q. Now, you -- and what were you offering per kilo?

A. $500 per kilo.

Q. How did Mr. King respond to that?

A. He was fine with it. You know, he wanted the large amount up front. You know, he wanted a nice amount up front. But when I explained to him the situation he was willing to take the 500.

Q. At one point in the conversation you said to Mr. King, I'll bring you five stacks Tuesday.

Do you recall saying that to him?

A. Yes.

Q. What were you referring to when you said five stacks?

A. It's a street slang for $5,000.

Q. A stack is a thousand dollars?

A. Yes.

Q. Now, at one point in the recording -- and it's found on page

3 of the recording -- page 3 of the transcript, Mr. King says words to the effect of I told you what we want, you know.
Do you recall him saying those words?
A. Yes.
Q. Who did you understand him to be referring to?
A. Mr. King was referring to himself and Mr. Zambrano.
MR. GRAHAM: Objection to what he was referring to, Judge.
THE COURT: All right. The answer may stand.
You may cross examine on the issue.
BY MR. PORTER:
Q. A little later on -- and it's referenced on page 5 of the transcript toward the bottom of the page, in the fourth entry from the bottom, Mr. King says words to the effect of unless you want to give, I don't know, half up front, I'll sell it real quick for me and Carnel, you know, and let us get something off of that.
Do you recall him saying words to that effect?
A. Yes.
Q. Did you have an understanding as to who he was referring to when he said me and Carnel?
A. Yes.
Q. Who?
A. Mr. Zambrano.
Q. And again, when he said let us get something off that, is

that again a reference to Mr. Zambrano?
A. Yes.
Q. Now, sir, at the beginning of this meeting Mr. Zambrano was present, was he not?
A. Yes.
Q. You referred to him as Viejo, correct?
A. Yes.
Q. It's fair to say that nowhere in that recording did you discuss this insurance business with Mr. Zambrano, did you?
A. No, I did not.
Q. Why not?
A. Well, because Mr. King already made it clear to me not to discuss this with Mr. Zambrano. This proposition was through me through King, and then Mr. Zambrano.
Q. When did he do that?
A. The last time we spoke. The previous time before this.
Q. On October 15th Mr. King had said to you yeah, no, we don't do it that way. I'll sit down with the Viejo and I'll get back to you.
Is that right?
A. Correct.
Q. Is that what you are referring to?
A. Yes.
Q. So on this day, on November 25th of 2006, did you give Mr. King any money?

A. No.
Q. Did you give him any cocaine on that day?
A. No.
Q. Okay. Fair to say you and he were sort of hammering out the terms?
A. Yes.
Q. Sir, I want to hand you what's been marked as Government Exhibits 66 and 67. And again, if I can trade with you.
Sir, do you have those documents in front of you?
A. Yes.
Q. Take a minute to familiarize yourself with them.
A. I'm ready.
Q. Okay. Is this another disk and then a transcript?
A. Yes.
Q. Which one is the disk?
A. Number 66.
Q. And have you listened to Government Exhibit 66 previously?
A. Yes.
Q. And does it contain a conversation that you participated in?
A. Yes.
Q. Does Government Exhibit 66 truly and accurately record a conversation that you had with other individuals, including Fernando King, on November 28th of 2006?
A. Yes.
MR. PORTER: Your Honor, I would move into evidence

Government Exhibit 66.

THE COURT: It is received.

(Government Exhibit 66 received in evidence.)

BY MR. PORTER:

Q. Do you have Government Exhibit 67 in front of you?
A. Yes.
Q. What is it?
A. It's a transcript.
Q. Do you understand it to be a transcript of the conversation contained in Government Exhibit 66?
A. Yes.
Q. Did you help to prepare Government Exhibit 67?
A. Yes.
Q. And again, sir, does Government Exhibit 67 truly and accurately transcribe to the best of your ability conversation contained within Government Exhibit 66?
A. Yes.

MR. PORTER: Your Honor, I would move into evidence then Government Exhibit 67.

THE COURT: For limited purpose, it is received.

(Government Exhibit 67 received in evidence.)

THE COURT: Proceed.

MR. PORTER: Your Honor, could I just have a moment to consult with my team here?

THE COURT: Yes.

(Pause.)

MR. PORTER: And, your Honor, could I have permission to publish?

THE COURT: Proceed.

MR. PORTER: I'm told this is a video, and so I'm going to just move this demonstrative exhibit.

THE COURT: It's a video and audio?

MR. PORTER: It is, yes.

THE COURT: Proceed.

BY MR. PORTER:

Q. And, sir, do you have Government Exhibit 67 in front of you?

A. Yes.

Q. And can you see on -- do you have a screen in front of you?

A. Yes.

Q. Okay. Is that showing what appears to be a still?

A. Yes.

Q. Okay. Go ahead.

(Government Exhibit 66 played in open court.)

BY MR. PORTER:

Q. Paused it for a moment, sir. Is that you walking into somewhere?

A. Yes.

Q. Where are you walking into?

A. The taqueria. Pisano restaurant.

Q. Okay. And that restaurant, did it have -- was it essentially

take-out? Or how was it arranged?
A. You can eat there if you wanted to, but it was walk-in, you know.
Q. How many seats were there for people to sit and eat?
A. Three or four. I don't really -- I didn't pay attention to it, but they had seats.
Q. Okay. Go ahead.
(Government Exhibit 66 played in open court.)
BY MR. PORTER:
Q. Was that a conversation you had with Mr. King on November 28th of 2006?
A. Yes.
Q. Do you recall that?
A. Yes.
Q. Now, first, in terms of where you were at the time that you and Mr. King talked, what was your location?
A. Well, when me and him had our conversation, I was in the next store over.
Q. It appeared somewhat vacant?
A. Yes. It was empty. He was remodeling it because he wanted to open a barbecue chicken place.
Q. And did you give Mr. King anything on that day?
A. Yes.
Q. What did you give him?
A. I gave him $2,000.

Q. Do you have an understanding as to what he was expecting?
A. He was expecting five --
Q. Why do you say that?
A. -- thousand dollars.
I'm sorry?
Q. Why do you say that?
A. Because that was our agreement, was to give him $5,000.
Q. And, in fact, as referenced on page 2, line 8 of the transcript, Mr. King says to you, is that five, is that correct?
A. Yes.
Q. And when he said that, what were you doing?
A. I was handing him the money.
Q. And how did you respond?
A. I told him no, that it was only 2000.
Q. Now, did you also talk to him about providing him with cocaine that day?
A. Yes.
Q. As referenced later on on page 2, at lines 20 and 21, did you say words to the effect of I'm going to hit you with a brick you asked me for because they are going to give me 50?
A. Yes.
Q. When you said you were going to hit him with a brick that he asked you for, what were you referring to?
A. To the kilo of cocaine that he wanted off the top of the 10.
Q. Okay. And when you said they're gonna give me 50, what were

you referring to?
A. That my drug suppliers were going to give me 50 kilos of cocaine.
Q. In your drug dealing, would you be able to make a profit if you got 50 kilos and you handed one off?
A. Yes.
Q. Is that different from getting 10 kilos?
A. Yes.
Q. When you said I'm going to hit you with a brick you asked me for because they are going to give me 50, how did Mr. King respond?
A. He said all right.
Q. And then you said, it's on its way already. How did he respond?
A. He said all right.
Q. Okay. Did you then have a discussion about a different matter concerning cocaine?
A. I wanted to know if he wanted to be a customer of mine.
Q. What were you offering them for?
A. I was offering to give him kilos at 17. You know, that's a good price in the drug business.
Q. Okay. And how did he respond to that offer?
A. He said no, no.
Q. And then on -- turning to page 4, line 7 of the transcript, does Mr. King say words to the effect of why do you think we

doing this?
A. Yes.
Q. Who did you understand him to be referring to?
A. Mr. King and Mr. Zambrano.
Q. Now, again here, sir, on November 28th of 2006, Mr. Zambrano is on the scene, is he not?
A. Yes.
Q. And the money that you were providing, what was your understanding of where it was going?
A. That it would go to Mr. King and Mr. Zambrano.
Q. At least some of it would go to Mr. Zambrano?
A. Yes.
Q. But you didn't pay Mr. Zambrano directly, did you?
A. No.
Q. Why not?
A. Because again, Mr. King already instructed me that this was between me and him first.
Q. Sir, I next want to hand you what's been marked as Government Exhibits 68 and 69. And again I'd ask you to take a look at these, familiarize yourself with them, and let me know when you're done.
A. Okay.
Q. Do you have both a disk and a transcript in front of you?
A. Yes.
Q. Government Exhibit 68, have you listened to that before?

And he is like, Loks, what's the first street? And then him and Loks, him and Loks really put it together.

And I'm in the background. And I'm looking over his shoulder, and I'm like, are we really going to draw a map of the Hood? I mean, we are smoking. I mean, this is how the Nation is doing it now.

And Loks joked, and he is, like, you'd be surprised how many rules get made, you know, while we're smoking.

Q. When you say we were smoking, what are you referring to?

A. We were smoking marijuana.

Q. Including yourself?

A. Yes.

Q. Now, what was the purpose? Did you also discuss the purpose for these maps?

A. Yes.

Q. What was the purpose that you discussed?

A. Well, then I asked, what's -- you know, that's my next question, like what is this all about.

He is, like, man, I want to arrange security like the military.

What do you mean?

I want to do a perimeter. He goes King brothers die all the time over there, you know. That's just how they live.

But there is hundreds and hundreds of brothers over there. And he is, like, it don't make no sense to have all these

guys clumped up in the middle, when you can use them like the Army, and you put 30 on this borderline, 30 on this line, 30 on this line, and so many soldiers in each hood.

It doesn't matter if you are a Trumbull King. You can go to Lawndale and do security. It doesn't matter if you are a Homan King. You can go to Drake and do security.

You know, that's what was our discussion that day was, being able to protect and control the hood and create a perimeter so that all the Latin King Incas would know how to distribute our soldiers.

Q. What hood are you referring to?

A. Well, this is the 26th Street region.

Q. Did you all ultimately draw some maps that day?

A. Yes.

Q. Are you familiar with the term rammers?

A. Yes.

Q. What's a rammer?

A. It's a truck. It could be a Suburban truck. It can be a K5. It's usually -- you know, it doesn't just have to be a truck. It could be a big-body Lincoln, could be a big-body Cadillac.

Q. What's it purpose?

A. Exactly what its name is, to ram, to ram vehicles that would come into our neighborhood attempting to pull drive-bys or to harm us, you know.

Q. Did Latin Kings use rammers by the point in time that you had

this discussion about the maps?
A. Yes.
Q. Was that part of this discussion?
A. Yes.
Q. How so?
A. Well, also along with the -- with the putting the soldiers where the soldiers needed to go, he wanted to know -- every hood -- well, I'm not going to say every hood, but a lot of the Latin Kings, we own those type of vehicles.

You know, it's a tank. It's a tank to us. You don't need a gun if you are in one of those, you know.

And he wanted to structure it so certain hoods might have two or three rammers. Okay, instead of you just keeping that rammer in your hood, you are going to put one of them over on Lawndale, you are going to put one of them on the Boulevard, you are going to put one of them on Central.
Q. Why would you put them in those locations?
A. Well, the reason we get killed is because our enemies cross our lines and they go in and kill -- you know, they kill our people.

But if we got the vehicles on the borderlines, let's say the enemy does happen to get through, this was around the time Nextel was very popular with us.

I hit the button -- and when I mean "button," the Nextel radio, and let's say they did get lucky and make it all the way

into the middle. They got to leave. It's not like they are going to fly out of there. They have to drive out of there.

And the rammers would be stationed to intercept the vehicles, either coming in or going out.

Q. I'm going to show you what's been marked and previously admitted into evidence as a portion of Government Exhibit 281, okay?

A. Okay.

Q. Take a look at these and let me know when you have familiarized yourself with them.

A. I'm ready.

Q. How many documents approximately do you have in front of you?

A. Ten.

Q. Do you recognize those documents?

A. Yes.

Q. How do you recognize them?

A. Well, I was there when these -- well, not these specifically were created, but ours looked like this because of the colors. I mean, we were -- that's what made it funny to us. We thought he was coloring.

Q. And what are those maps of?

A. This is the -- you know, when you asked me about regions, this is what our region -- you know, if you wanted me to draw you what a region looks like, this is the 26th Street region right here.

These are where all the Latin Kings are.

Q. You can put that one aside, sir.

I want to show you what's been marked as Government Exhibits 56 and 57. And as I have done that, I'm taking back the other exhibits from you.

A. Okay.

Q. I'm sorry. Let me know when you are ready.

A. I'm ready.

Q. Okay. Do you have Government Exhibit 56 in front of you?

A. Yes.

Q. What is it?

A. It's a CD.

Q. Have you listened to that CD previously?

A. Yes.

Q. Do you understand it to contain a conversation principally involving Fernando King on or about June 1st of 2006?

A. Yes.

Q. Does the CD that is Government Exhibit 56 truly and accurately depict the conversation that you participated in and listened to on June 1st of 2006?

A. Yes.

MR. PORTER: Your Honor, I would move into evidence Government Exhibit 56 at this time.

THE COURT: It is received.

(Government Exhibit 56 received in evidence.)

BY MR. PORTER:
Q. Sir, do you have Government Exhibit 57 in front of you?
A. Yes.
Q. Is it a 22-page document?
A. Yes.
Q. Did you assist in its preparation?
A. Yes.
Q. What is it?
A. This is the transcripts of the CD.
Q. The transcript of the CD that is Government Exhibit 56?
A. Yes.
Q. Does Government Exhibit 57 truly and accurately transcribe to the best of your ability the conversation contained within Government Exhibit 56?
A. Yes.
MR. PORTER: Your Honor, I would move into evidence Government Exhibit 57.
THE COURT: 57 is received for a limited purpose.
(Government Exhibit 57 received in evidence.)
MR. PORTER: Your Honor, I would ask to publish Government Exhibit 56 at this time.
THE COURT: Yes. This is the lengthy one to which you referred yesterday.
MR. PORTER: Yes.
THE COURT: All right.

BY MR. PORTER:
Q. So sir, I'm going to -- I think we are going to play the whole thing, and then I'm going to ask you some questions about it, okay?
A. Okay.
THE COURT: All right. You may proceed.
(Government Exhibit 56 played in open court.)
BY MR. PORTER:
Q. All right. I have already broken my promise.
Are you following along on the transcript?
A. Yes.
Q. Okay. And did we stop the recording at approximately line 10 of the first page of the transcript?
A. Yes.
Q. Okay.
(Government Exhibit 56 played in open court.)
BY MR. PORTER:
Q. Sir, let's start with the end. That recording ends with Mr. King saying King Love, do you recall that?
A. Yes.
Q. What does that mean?
A. It means what it says, King Love. That's a slogan we have. It's -- it's the way we say -- it's a pride thing. It's the way we say goodbye.
Q. Who was present at this meeting?

A. The Supreme Inca, Mr. King, the Regional Inca, Baby, and eight Incas from the Crown Town area. And then the three bodyguards, which was -- I was one of them.
Q. Who were the other two?
A. Anthony Zizzo, which is Maise, and Adam Butler, which is Bam Bam.
Q. What were you providing security for?
A. Well, I was Mr. -- I was Mr. King's bodyguard that day. I strip-searched everybody. I was the one that did security for the meeting.
Q. You said you identified a man named Baby who was there?
A. Yes.
Q. He was the Regional Inca for who?
A. Crown Town.
Q. Did this meeting come before or after the incident at Frankie and Johnny's that you had testified about yesterday?
A. This was the aftermath of it.
Q. Was anyone being violated on this day?
A. Yes.
Q. Who?
A. The Inca from 58th and Hamlin got -- he got violated.
Q. Who violated him?
A. The Incas from his hood.
Q. Mr. King discussed that to a certain extent during this discussion, did he not?

A. Yes.
Q. Sir, could you turn to the 18th page of the transcript.
A. Okay.
Q. Referencing lines 36 and 37, do you recall Mr. King saying words to the effect of Incas from Crown Town, they are the only ones able to put a hand on you?
A. Yes.
Q. What was he referring to there?
A. Well, as Latin Kings, when you're an Inca, you know, only Incas violate you. It's -- it's just a rule we have. Soldiers beat up soldiers. Incas beat up Incas.
Q. Since we're at the back, Mr. King said words to the effect of he used the term hot summer a couple of times during that talk.
Do you recall that?
A. Yes.
Q. There is one reference to it, is there not, at page 20 of the transcript, at line 40?
A. Yes.
Q. He said words to the effect of, but the hot summer is coming up, did he not?
A. Yes.
Q. What did you understand him to mean when he used the term hot summer?
A. We gang bang more in the summer, Latin Kings, you know. We -- we get into more confrontation in the summertime.

Q. With who?
A. With our enemies.
Q. Who are they?
A. It's all the -- anybody that isn't a Latin King. Satan Disciples, Two-Six, GDs, it doesn't matter. In the summertime we gang bang with anybody that wants to gang bang with us.
Q. Rival gangs?
A. Yes.
Q. Now I'm going to turn to the beginning of this just a minute and go through a couple things. But before I did, you at some point on the recording -- and it's found at page 16, line 22 -- you said words to the effect of he -- he that truck, he jumped out of the car on your screen.

Do you recall saying those words?
A. Yes.
Q. Who were you referring to?
A. Well, we were in a basement, and we had video cameras. You know, houses have home security. Well, this particular home had home security.

And in the basement I'm on security. I'm listening, but I'm paying attention to the screen. Because it shows the front and the back of the house.

And apparently that was the King brother, the Inca from Sacramento had showed up late. But I watched the entire time when the car showed up, and I was letting 'em know he jumped out

of that car.
Q. Okay. Sir, at the top of that page there is a reference to Mr. King saying at lines 2 and 3, if it's your hood, you protect your hood to the fullest.
Do you recall him saying that?
A. Yes.
Q. What did you understand him to mean by that?
A. Well, again, when I was a Latin King, we protect our hoods. You know, we will kill you, bottom line. You come in our hood trying to hurt us, we're going to hurt you right back.
Q. That -- that phrase, if it's your hood, protect your hood to the fullest. Is that part of the rules of the Latin Kings?
A. Yes.
Q. Was that the only time during this meeting that Mr. King discussed the rules of the Latin King Nation?
A. No.
Q. Could you turn to the front of the transcript as an aid to this discussion.
At the beginning of this discussion -- and it's found at lines 25 and thereafter -- Mr. King says words to the effect of, we don't go for none of that, man. We don't go for it. We don't go for it in Houston, Texas. We don't go for it in New York City, in New Jersey, Connecticut. We don't go for it.
Do you recall him saying those words?
A. Yes.

Q. Who did you understand him to be referring to when he said that?
A. He was referring to himself and Mr. Zambrano.
Q. He then said, and where is it coming from, 26th Street?
Do you recall him saying that?
A. Yes.
Q. When he said 26th Street, what did you understand him to be referring to?
A. That's our region. That's headquarters.
Q. On the bottom of page 2 of the transcript, beginning at line 38, Mr. King says words to the effect of because it's coming from a strict god dam region.
Do you recall him saying that?
A. Yes.
Q. What region do you understand him to be referring to there?
A. The Little Village region. 26th Street.
Q. He then says because we're responsible for homicide.
Do you recall him saying that?
A. Yes.
Q. What did you understand him to refer to there?
A. Again, 26th Street. That's when they gang-bang to a different level there, you know. The brothers kill or be killed where they come from.
Q. Different than the suburbs?
A. It's a lot different.

Q. How so?
A. They have more enemies. You know, we are all Latin Kings. You know, people want to kill us every day.
But over there -- over there there is -- hundreds on top of hundreds and hundreds of King brothers. There is hundreds and hundreds on top of hundreds of their enemies.
And where I'm from, yeah, I got enemies, but there's not hundreds of them. There's not -- you know, my neighborhood doesn't have that type of rivals, you know, where we're from.
It's harder over there. It's more powdery. It's kill or be killed over there.
Q. A short time later -- and jumping to page 3 of the transcript -- there is a discussion of heroin. Do you recall that?
A. Yes.
Q. Specifically concerning Latin Kings in Humboldt Park?
A. Yes.
Q. Did the Latin Kings have rules concerning heroin?
A. Yes.
Q. What were they?
A. We don't use them and we don't sell them.
Q. That was a rule we discussed a couple days ago?
A. Yes.
Q. There are other drugs that Latin Kings can use and sell?
A. Yes.

Q. Why -- if you know, why was heroin different?

A. It's looked upon worser than -- you know, cocaine is accepted, marijuana is accepted. But heroin, it's stronger drugs in the Latin Kings' eyes.

We see what it did to Humboldt Park, to the King brothers in Humboldt Park, it really messes them up. So they stopped it before it can reach out to the rest of the neighborhoods.

Q. A little above that discussion, found on page 3, I believe at line 4, Mr. King says words to the effect of that's why we stricter on 26th Street, and that's why 26th Street offer the policies to Crown Town, offer the policies to Southwest Region, offer the policies to Connecticut, Houston, Texas, Florida. God dam it around the god dam states.

Do you recall him saying those words?

A. Yes.

Q. When he was referring to the policies, what did you understand him to refer to?

A. It's the rules that we got -- well, again, when I was a Latin King we received the policies, three pages long. And it was -- I mean, we have our mandatory rules of the Constitution. But the Nation can pass any rule, and those were part of the rules. You know, he is talking about the rules that we receive. They are called the policies or the Code of Conducts.

Q. So it's the Constitution?

A. Yes.
Q. The Manifesto?
A. Yes.
Q. And also these three-page rules that you discussed earlier?
A. Yes.
Q. Sir -- and I'm referring to page 4, beginning at approximately line 27 -- at various points in time Mr. King uses the term trickin'.
Do you recall that?
A. Yes.
Q. And at one point, at line 27 of page 4, he says words to the effect of, with all the trickin' going on.
Do you recall him saying that?
A. Yes.
Q. What was your understanding of what that term trickin' means?
A. When another Latin -- well, tricking is when somebody tells.
Q. Someone cooperates with the police?
A. Yes.
Q. He goes on to talk about paperwork.
Do you recall that?
A. Yes.
Q. In fact, here he says, with all the trickin' going on, and all the god dam paperwork, we wait for the paperwork.
Do you recall him saying that?
A. Yes.

Q. Do you have an understanding as to what he means when he uses the term paperwork?
A. Yes.
Q. What is it?
A. Well, again, as Latin Kings, you can't accuse a brother of doing anything without proof. You could say that I'm telling, you could say that till you're blue in the face.
But back in the days technically you got to show them paperwork. You can't accuse a brother of being a snitch or a rat or a trick.
What proof do you have?
Well, I feel it.
That doesn't carry no weight within the organization.
But if you provide actual paperwork, signatures of some sort, transcripts, then that brother is dead. He is a dead man.
Q. So paperwork means what?
A. The testimony, the cooperation, anything to do with the individual or the individual that he is telling on.
Q. Paperwork such as a transcript of your testimony?
A. Yes.
Q. Now, Mr. King then says wait for the paperwork, ain't no fuckin' -- we don't do that no more, man.
Do you recall him saying that?
A. Yes.
Q. What did you understand him to mean when he said that?

A. Well, again, that's how it used to be.
Q. What's how it used to be?
A. When we think a King brother is telling we have to provide paperwork. And Mr. King is assuring the Incas that we don't wait anymore. There is too many Latin Kings in prison, you know, like you said, 75 percent of the brothers that are in prison are there because we waited.
He is letting the brothers know we don't wait anymore. You think someone is snitching, well, you know what you got to do.
Q. He says nowadays you don't need paperwork. I ain't gotta tell you, man.
Do you recall him saying that?
A. Yes.
Q. Is he making the same point?
A. Yes.
Q. On the next page of the transcript, page 5, beginning at approximately line 28, there is a discussion of Incas, is there not?
A. I'm sorry. What line did you say?
Q. Beginning at line 28 onto line 29, where he says but that's one policy we keep up, is all Incas full responsible, full responsible.
A. Yes.
Q. What do you understand him to be referring to there?

A. Again, he is talking about our rules, the rules that are passed down to us as Incas.

That's a rule. We are responsible for the actions of all our soldiers.

Q. Can you turn the page again. At some point during this conversation Mr. King is asked a question by one of the other individuals there, correct?

A. Yes.

Q. What is he asked?

A. He is asking him if he is serious about the paperwork. If he is serious that you don't have to wait for the papers anymore.

Q. Specifically, that that individual says, about that trickin' part, can we seriously not have to wait for the papers?

Is that what you are referring to?

A. Yes.

Q. And how does Mr. King respond?

A. He tells him, was I speaking Chinese? You know, he said, I made it clear to you already, in our code or the way we talk.

Q. And then he spells it out some more on page 7, does he not?

A. Yes.

Q. He says, didn't fucking wait for no fucking god dam documents, at approximately page 7, line 6, is that right?

A. Correct.

Q. What did you understand him to mean?

A. There he is referring to the way that the Mob used to, you

know, just kill people, if they even thought they were telling.
Q. He uses the term documents there, do you see that?
A. Yes.
Q. In addition to the transcripts that you alluded to, are there other court documents that would constitute this paperwork?
A. Yes. My plea agreement, you know. There is plenty of paperwork.
Q. At line 15 on page 7 do you recall Mr. King saying words to the effect of, I didn't need no paperwork. You got to use your judgment, man. If you feel the brother was a trick, yeah, god bless that trick, man.
Do you recall him saying those words?
A. Yes.
Q. What did you understand him to mean there?
A. Again, if you -- you know, if you're an Inca you are responsible for your soldier. If you feel that that -- your soldier is telling, well, may god bless him. After he is dead, may god bless him.
Q. Now, sir, there is a final sequence I wanted to talk with you about here. It picks up at the bottom of page 7.
Does Mr. King start to discuss killers?
A. Yes.
Q. In fact, at approximately line 31, does he say words to the effect of find the killer out the crowd, man, so you don't send the next poor kid who don't know how to kill to the next stupid

mission. He gets jacked up, kicked on his fucking body.

That's why the Mob was so successful.

Do you recall him saying those words?

A. Yes.

Q. Did you have an understanding as to what he was referring to there?

A. Again, you are an Inca of your hood. You got 25 guys. Not everybody in there is a killer. Might be only one out of 25. Some of the guys are tattoo artists. Some of the guys are taggers. Some of the guys are drug dealers. Some of the guys could be potential leaders.

It's your responsibility as Inca to know who the killer is, to know who -- you know, it's not easy to take a man's life. And he is telling the Incas it's their responsibility to find out, you know. To find out who that is and use them.

And that's why the Mob was so successful, because their killers didn't go do security. You know, they didn't send their killers to spray paint a wall.

He is just using that as a reference.

Q. The bottom of that page he says, I got brothers who pulled a burn one time and they ain't never came out the same, look.

Do you recall him saying towards to that effect?

A. Correct.

Q. What did you understand him to mean by that?

A. Well, a burn is -- the word burn is street slang for pulling

a drive-by or doing a mission. You know, those are terms that we use. You know, and some brothers have done it once and, you know, they ain't never been the same.

MR. PORTER: Thank you, sir.

I have no further questions.

THE COURT: This will be an appropriate time to take a lunch break.

Please come back at 1:00 o'clock, members of the jury, at which time the defense will cross examine.

(Jury out.)

THE COURT: Okay. Court is in session.

All right. The jury has left the room.

Who will begin the cross examination?

Mr. GRAHAM: I will, Judge.

THE COURT: All right. 1:00 o'clock.

Mr. GRAHAM: Thanks.

(Proceedings recessed from 12:00 p.m. to 1:00 p.m.

## McDonald, James G

**From:** MILTON SHANNA [miltonshanna@yahoo.com]
**Sent:** Friday, August 21, 2009 4:52 AM
**To:** Weismantel, Christopher G.; McDonald, James G

LOOK GUYS I HAVE TO HONEST HERE. I BEEN THINKING ABOUT THIS FOR ALONG TIME NOW AND HAVE NO REACHED MY BREAKING POINT. I CAN'T HELP BUT FEELING THAT I'M GETTING MISTREATED AND MY NEEDS ARE BEING NEGLECTED. I'VE BEEN STRUGGLING FOR TOO LONG NOW. THERE'S NO WAY THAT THIS SHOULD BE GOING ON. I HAVE NO MONEY, I HAVE NO SECURE IDENTITY. I FEEL THAT BECAUSE I'M A GUY FROM THE STREET I DON'T GET MY DUE RESPECT WHERE IT'S DUE. I EMAILED YOU GUYS ON JUNE 2ND PLEADING WITH YOU GUYS TO LEND A HAND WITH MY NAME CHANGE. IF TOM WILSON ISN'T WILLING TO TAKE THE STEPS IN HELPING ME OUT, THEN TOM WILSON CAN SIT IN THE CHAIR MONDAY WHEN IT'S TIME TO PRODUCE YOUR WITNESS AND ALSO IN THE GRAND JURY SEAT. IF I'M NOT IMPORTANT ENOUGH TO GET HELP THEN WHY SHOULD I FEEL COMPELLED TO KEEP DOING THIS. EVERYBODY INVOLVED IN THIS CASE IS PROGRESSING, EVERYONE BUT ME. I HAVE BEEN PATIENT AND HOPEFUL THAT THIS WOULD RESOLVE IT'S SELF, BUT UNFORTUNATELY PATIENCE AND HOPEFULNESS DOESN'T KEEP ME FROM GETTING KILLED OR PAYING MY BILLS. I FEEL LIKE I'M A MULE AND AS LONG AS YOU GUYS GET WHAT YOU NEED THAT'S ALL THAT MATTERS. "AWE WE'LL DANGLE A CARROT AND HE'LL BE ALRIGHT FOR AWHILE." THINGS SHOULDN'T HAVE GOTTEN TO THIS POINT BUT THEY HAVE. WHY AND HOW IT GOT TO THIS POINT IS YOUR GUYS JOB TO FIGURE IT OUT AND AMEND IT. I DIDN'T SIGN UP TO BE A ONE MAN TEAM. AS MANY TIMES AS I HAVE WENT THE EXTRA MILE FOR THIS CASE I SHOULDN'T BE IN THIS PREDICAMENT. EITHER START SHOWING THAT I'M IMPORTANT TO YOUR ORGANIZATION OR CW1 IS GOING TO TAKE AN EARLY RETIREMENT. IF I HAD ANDREW'S EMAIL ADDRESS HE WOULD BE INCLUDED IN THIS LETTER AS WELL.

**McDonald, James G**

**From:** MILTON SHANNA [miltonshanna@yahoo.com]
**Sent:** Friday, August 21, 2009 4:52 AM
**To:** Weismantel, Christopher G.; McDonald, James G

LOOK GUYS I HAVE TO HONEST HERE. I BEEN THINKING ABOUT THIS FOR ALONG TIME NOW AND HAVE NO REACHED MY BREAKING POINT. I CAN'T HELP BUT FEELING THAT I'M GETTING MISTREATED AND MY NEEDS ARE BEING NEGLECTED. I'VE BEEN STRUGGLING FOR TOO LONG NOW. THERE'S NO WAY THAT THIS SHOULD BE GOING ON. I HAVE NO MONEY, I HAVE NO SECURE IDENTITY. I FEEL THAT BECAUSE I'M A GUY FROM THE STREET I DON'T GET MY DUE RESPECT WHERE IT'S DUE. I EMAILED YOU GUYS ON JUNE 2ND PLEADING WITH YOU GUYS TO LEND A HAND WITH MY NAME CHANGE. IF TOM WILSON ISN'T WILLING TO TAKE THE STEPS IN HELPING ME OUT, THEN TOM WILSON CAN SIT IN THE CHAIR MONDAY WHEN IT'S TIME TO PRODUCE YOUR WITNESS AND ALSO IN THE GRAND JURY SEAT. IF I'M NOT IMPORTANT ENOUGH TO GET HELP THEN WHY SHOULD I FEEL COMPELLED TO KEEP DOING THIS. EVERYBODY INVOLVED IN THIS CASE IS PROGRESSING, EVERYONE BUT ME. I HAVE BEEN PATIENT AND HOPEFUL THAT THIS WOULD RESOLVE IT'S SELF, BUT UNFORTUNATELY PATIENCE AND HOPEFULNESS DOESN'T KEEP ME FROM GETTING KILLED OR PAYING MY BILLS. I FEEL LIKE I'M A MULE AND AS LONG AS YOU GUYS GET WHAT YOU NEED THAT'S ALL THAT MATTERS. "AWE WE'LL DANGLE A CARROT AND HE'LL BE ALRIGHT FOR AWHILE." THINGS SHOULDN'T HAVE GOTTEN TO THIS POINT BUT THEY HAVE. WHY AND HOW IT GOT TO THIS POINT IS YOUR GUYS JOB TO FIGURE IT OUT AND AMEND IT. I DIDN'T SIGN UP TO BE A ONE MAN TEAM. AS MANY TIMES AS I HAVE WENT THE EXTRA MILE FOR THIS CASE I SHOULDN'T BE IN THIS PREDICAMENT. EITHER START SHOWING THAT I'M IMPORTANT TO YOUR ORGANIZATION OR CW1 IS GOING TO TAKE AN EARLY RETIREMENT. IF I HAD ANDREW'S EMAIL ADDRESS HE WOULD BE INCLUDED IN THIS LETTER AS WELL.

Movant, * 08-CR-746

VS. * Civil Case No.

UNITED STATES OF AMERICA, * ____________________

AFFIDAVIT OF JULIO LEIJA SANCHEZ

Julio Leija Sanchez declares under the penalty of perjury:

1). That I am the leading defendant in the miquero fraudulent document case.

2). At no time during the investigation of my case did Special Agent Dan Nagy ever approach me and ask me if I or the miqueros was ever extorted by the Latin Kings nor did I ever have any knowledge that such extortion took place during the time frame of my conspiracy.

(Proceedings heard in open court:)

THE COURT: Good afternoon, members of the jury.

The government may make its rebuttal argument.

REBUTTAL ARGUMENT ON BEHALF OF THE PLAINTIFF

MR. PORTER: At the age of 13, when the toughest decision a young boy should have to make is whether he is a Cubs fan or a Sox fan, these four men, and others under their control, beckoned such boys, recruited such boys to do their violence.

What is this case about? It's about the Little Village Region of Chicago, which these four men and others under their control turned into their own personal killing fields.

This case is of paramount importance because those four men, and others under their control, had an insatiable appetite for violence.

I thought about -- and you are going to hear about -- the things that they wrought. But I want to make one thing clear right at the beginning because of something that Mr. Sanan said, because he misstated the law. In order to find a pattern of racketeering activity, one or more members of the conspiracy would commit at least two separate acts of racketeering.

Not any of those guys personally. Just that when they signed up to be in the enterprise, they knew, they agreed, that someone, anyone, would commit two acts of racketeering.

Because as Judge Norgle is going to instruct you, the government does not have to prove that the racketeering acts were

actually committed or that the defendant agreed to personally commit the racketeering acts.

Just someone within the enterprise. Okay?

Because what you heard from him and what you heard from other counsel who just argued over the last day was, as I like to call it, the Hey Batta Batta defense.

And it's appropriate to think in those terms right now, opening day, major leagues, right? About the time when I was eight years old, a long, long time ago, learning how to be a baseball player standing up at the box, and all those guys in the field, what are they doing, right?

Hey Batta Batta. Hey Batta Batta.

And what are they doing that for? Trying to distract me. Trying to get me off my game. Trying to get me to lose my focus.

And what you heard from those four gentleman was a lot of Hey Batta Batta. Because what their clients wrought was beatings, was shootings, was killings, over and over and over again.

And when you hear well, a shooting is not an act of racketeering. That's a Hey-Batta-Batta moment.

And you know why that is? Because what you heard from the witness stand was shoot to kill. They shot to kill.

Soldiers that were their emissaries were instructed to shoot to kill.

Beatings. January 28th, 2006, Chongo gets beaten. Exhibit 47. You heard it, you saw the transcript.

March 2006, you saw the beating.

May 28th, 2006, Frankie and Johnny's twice, two Latin Kings violated, stopped only when that guy said that's enough.

September 23rd, 2007, Godfather violation. That guy in the back in the blue shirt, Mr. Guzman, who had nothing to do with any of this, right? Who was the one chatting everyone up about Godfather? Mr. Guzman.

The September 23rd violation of the diabetic. Remember Mr. Guzman talking about that? Another violation. Another beating. Proves he is involved in this enterprise.

September 24th, 2007, two Spanish Harlems getting piped. Do you remember all that discussion by Mr. Guzman?

September 30th, 2007, this one might have even escaped our notice. But Milt Shanna is going out to get the cocaine from this man, Mr. Garcia, at his home, 556 Emerson in Bolingbrook. And they talk about what happened with the Drake 31st? How much you guys give 'em? Two and a half. Two and a half.

And we now know, after four and a half weeks of hearing this evidence, what that means. Two and a half minute violation.

October 5th they talk about Rascal. Put on hold by that man, Mr. Zambrano. And when he is found with the Morgan and 33rds, Milt Shanna talks to this man, Vicente Garcia, who says take care of business, and so Rascal gets violated.

October 25th, Luis Garcia coming to get his cocaine, reports in that they left some Ds balled, in a ball. They have -- remember, they had the weapons stashed so they just beat them up with their fists.

November 5th, 2007, the Baretta violation is actually that summer but they talked about it on November 5th.

And here was actually another Hey Batta Batta moment, just this morning. Mr. Sanan says Mr. Caquias was lying. Remember Ruben Caquias testifies he is at the park, he is at the Humboldt Park picnic in the summer of 2007?

Three carloads. Jose Guzman and his henchmen come in, Mr. Guzman has words with Baretta, and then he is beaten, right? And he says well, no, that couldn't have happened because Milt Shanna was there and it wasn't recorded.

That's a Hey Batta Batta moment. Because Milt Shanna wasn't there. That was in the summer of 2007. Milt Shanna was there with 300 other Latin Kings, and we will talk about it, in November of 2007.

November 9th Mr. Zambrano discussing Vicky Lou. They beat him with a bat.

December 11th, 2011 -- 2007. The Internet violations. Do you recall those? And again, by the way, the focus from Mr. Sanan about Mr. Guzman was November of 2007. And there was a lot going on then, and we'll talk about it.

But December 11th, 2007, Government Exhibit 159. You

remember the Internet violations? Guzman at that time still a Regional Enforcer. Conferring with his colleague, as far as he knows, Milt Shanna, another Regional Enforcer. And they talk about what the violation is going to be.

And ultimately Mr. Garcia decides no, we're going to actually lay hands on these Incas because their soldiers screwed up. And Mr. Guzman is the one who administers those, oversees those.

What have those four men wrought? All those beatings. All those beatings. And the reason why they are important is because all of those beatings, most of which are internal, most of which are Latin King on Latin King, is because it keeps order. It keeps order. It keeps the trains running.

So that when Jose Guzman picks up the phone and says you five sections are going to go out and do a burn, they comply. Internal discipline.

If you're not on your function, then how can you be expected to be a good soldier and go out and protect your neighborhood? That's what these beatings are about.

Shootings. Shootings. Shooting after shooting. Shoot to kill.

Now, those aren't my words. Those aren't my words.

Those are the words of the witnesses on the witness stand. All of them who testified, when you're shooting at someone you are shooting to kill.

That, in the book of everyone I guess other than Mr. Guzman's counsel, is a predicate act. Because shooting to kill is attempted murder. And that's a predicate act.

And when you make a phone call and send five people out and remind them, you're agreeing in your mind, in your head, that they are going to go out and try to kill someone.

And it went on and on. Alfonso Torres we heard about. He testified.

And you heard that gang membership alone isn't a crime. And that's right. And Judge Norgle is going to instruct you as such.

It's one of two parts, which is why Miss DePodesta talked about gang membership. Are they members? That's checkmark number one. And then did they agree to patterns of racketeering?

Alfonso Torres. You saw him. You saw him. And he is a gang member. But in this courtroom and on that witness stand he was a victim. He was a shooting victim.

17-year-old kid gets shot, as it happens, by another 17-year-old kid. Ernesto Grimaldo. Yeah, he was a gang member. But that doesn't justify him getting shot. But that's what these four men created and maintained.

Keith Morgan. He is a shooting victim. He told you about it by another one of the sections of the Latin Kings. In November -- I'm sorry, in October of 2007.

Jorge Camargo, you heard about him, and we will talk about that shooting a little bit more in a little bit.

Jaime Galvan, and I've got him twice. Two separate shootings. Now we didn't play that entire transcript -- or, I'm sorry, we didn't play that entire recording of Rudolfo Salazar's discussion with Milt Shanna, January 25th, 2008, but you'll have it. It's in evidence. If you want to listen to it, follow along, feel free to do so.

But what he talks about -- and there was some testimony about this -- is that Rudolfo Salazar comes in with his friend Milt Shanna, says yeah, we went out, did this shooting, it's mandatory already. Do you remember? Do you remember that testimony? It's mandatory already.

It's mandatory. Their rules. Their rules.

And there are two shootings up there because if you recall -- and if you don't you can go back and take a listen -- he talks about yeah, the Homans already went out as well. The Homans already went out, did a shooting. Fairfield and 18th, I believe, was what they were reporting.

Which again, makes sense. Yeah, guys are going out. Homans already went out.

So there is five right there in a pretty short period of time.

Samuel Gutierrez, now he is a Latin King. He got shot, causing Jose Guzman to pick up the phone and make sure that five

sections are on their function.

Bears game, right? Jose Guzman makes those calls and then goes back to his dinner.

And I've got two shootings right there. Because to be fair, what Mr. Guzman said in his post-arrest statement was that he thought that only two or three actually went out and did the shootings. So we'll call it two or -- or -- for our purposes.

And he also told Agent Weismantel what happened when people didn't go out and do shootings and there were going to be repercussions for them. But we'll call that two.

Paul Gonzales. Hustler. You heard him on tape. And you also heard him talking to Milt Shanna, saying he got shot in the neck.

And then there is another discussion a little bit later, a couple days later, between Mr. Garcia and Mr. Shanna in which they discuss Hustler's shooting. And if you recall, there was some testimony that Mr. Garcia says yeah, and the police said they found him but Gonzales said no, I don't want to. I don't want to pursue it. I don't want to pursue it. Right?

Because they would settle up themselves in the Little Village Region, which they control. That was their Nation. That was their laws.

Because snitching didn't just apply to Milt Shanna and Jesse Guajardo and Ernesto Grimaldo and Ruben Caquias. It didn't apply to Nedal Issa. It didn't apply just to them just telling

others, it applied to them going to the police at all about anything.

Milt Shanna got shot, January of 2008.

Danny Dominguez, October 23rd, 2007. They are just sitting there in the car shooting the breeze, ready for Danny Dominguez to distribute more cocaine as part of the Little Village distributions. I sent two -- two boys in the morning. He say he seen they go -- go like that. They fall and shit.

Another victim. Another victim of their violence.

Fernando Vasquez, remember this? The Deuces popped one of my boy's sister. Another victim. A young girl who is just out, just outside, gets shot in the back, caught up in the gang crossfire.

Their fault. Their fault. That is what they wrought.

And then, not surprisingly, nine days later Mr. Vasquez reports again them Deuces came out of the alley, bro', so we let loose three times, the three shells we had.

And do you remember what Mr. Vasquez's response was when they talked about that gun, right? My boy had to toss the gun. And we don't have any guns anymore. We're going to have to go take care of that lady.

An innocent woman, doing the appropriate thing, going to the police. And the Latin Kings' reaction? We're going to have to take care of her.

And then shootings involving Milt Shanna. Either that

he personally did, twice, or that he was ordered to do and he sent down an order, ordered sometimes by Vince Garcia, ordered sometimes by Fernando King.

During time periods when he was a full-blown Latin King, when he was doing their business, and he told you about them.

19 different shootings that you heard about in these four weeks.

And there were killings. Rudy Rangel, another Latin King. Caught up in the violence, gets killed, gets murdered.

Oberia Pierce, that is the killing that Mr. Morgan talked about, that his friend gets killed.

Two Latin Kings killed in a bar on 30th. Do you remember Vince Garcia saying we need to step up the security there. This can't happen.

This is what they wrought. This is what those four men wrought.

Now, I'm going to spend a few minutes on each of these four defendants individually. Because there was argument about each of them. And the argument as to Mr. Zambrano was -- one of these things was they said well, you know, you had Gino Colon and Baby K, they were Coronas, right? But even Mr. Graham didn't say that he wasn't.

These guys aren't on here because they're not on trial. Mr. Zambrano is. This case is about him, and his activities, and his dealings.

So let's talk about it. Was he really the Corona? You know he was.

The very first exhibit that we present to you, this is the head, the Old Man, the Old Man. Referring to Augustin Zambrano in July of 2004. And that remained consistent and that remained the message, because he was the Corona in 2004, in 2005, in 2006, all the way until today as he sits there before you.

One of the three leaders of this gang.

November 5th of 2007, Exhibit 95 is the transcript. They are talking about a female who is running a Connecticut chapter of the Latin Kings. Yeah, they asked me if it was cool. That's Mr. Zambrano's words. They asked him.

They didn't ask Mr. Garcia. They didn't ask Mr. Guzman. They didn't ask Mr. Chavez. They certainly didn't ask Jesse Guajardo.

They asked that man right there because he is the leader of them. Throughout this country, but certainly in the 26th Street Region.

Mr. Garcia in October of 2007, that's what he said, I don't know, he said get your people ready. Whatever.

He said. Mr. Zambrano said. Let's take just a minute about that the quote, okay?

Now, Mr. Graham said -- I made a note of it -- he talked about mindreaders, right? Do you remember that? He said sometimes it made sense, sometimes it didn't, right? The

interpretation here was that what he said is Mr. Zambrano. And there were multiple instances of that, right?

Sometimes it made sense, sometimes it didn't.

But he didn't give you even one example, not one of where it didn't make sense, right?

And then the lawyers this morning, they say listen to the recordings, these transcripts, prepared by the witnesses who have a reason to pull the wool over your eyes, or whatever, right?

You should listen to the recordings. You should look at the transcripts. But you were sitting here for these five weeks going over this stuff, dutifully looking at those transcripts as the recordings came in.

Not once, not one time did counsel for Mr. Chavez or counsel for Mr. Guzman, not once did they point out a mistake, a problem, an error.

You are the judges. Absolutely. But they didn't even refer you to one example of that.

One more note on the transcripts: When you go back to deliberate you are going to get all the evidence in the case. And if you remember, on the transcripts they are not evidence, they are guides. They are for you to use as you're listening to recordings. It's your choice to have the transcripts.

If you ask for them, you will have them. You won't have them immediately when you go back. So if you want them, write a

quick note to the Judge, say please send the transcripts back, and they will be sent back for you. Okay?

But let's return to Mr. Zambrano as the Corona. Forehead wants that spot. Had Gino write me a letter. Right? That's Mr. Zambrano talking. Gino is the other Corona.

DeJesus: To my understanding is the Corona, one for the south side, one for the north side. And as you heard about in this trial, that's pretty much right. That's pretty much right.

Zambrano is in control in the south side. DK, the third guy, he is in Florida or Arizona or somewhere. He is retired, right?

But Gino is in charge of the north side. Mr. Zambrano is in charge of the south side.

Garcia: Stop that. There is only one. That's it.

In the context of that conversation he is talking about Zambrano. There is only one, there is only one Corona out on the street calling shots, and it's the man who is sitting here in that courtroom, Mr. Zambrano.

He has his own security, right? His private secret service who will die for him. Yeah. They took all his security away. He is talking about DK. Or, I'm sorry, he is talking about Baby K. BK. He was a Corona, they took his security away. Corona equals you get your own security.

And then on November 10th, when the cooperating witness was on the phone talking to Mr. Garcia and Mr. Garcia says hey,

pull over. You know, pull off and drive with Baby A.

Cooperating witness was saying okay, I was just trying to stay outside of the Old Man. He was acting as -- he was driving in another car acting as his security.

Again, very first recording we heard what you sent down. Do you remember what that was about? We heard what you sent down that Mr. Zambrano wanted Mr. Guajardo and his Latin Kings from Lenzi to be security in the bars in Summit.

And then finally this reference, Exhibit 199. This is the March 13th, 2008, recording where if the bird falls from the sky, or the raindrop, or all that garbage, where he is talking and threatening Rudolfo Salazar to Milt Shanna, right? And they are talking Maria, Mr. Zambrano's acquaintance.

And Mr. Zambrano says sometimes it finally pays to know. And what he is talking about there is his recognition that yeah, he is the man. It pays to know me because she can shoot off her mouth without repercussions, right?

Mr. Zambrano also talked a lot about trust. And it's important to think about when we are thinking about all of the words he said, and all of the actions others took on his behalf.

Because what we saw here through the course of these weeks was Augustin Zambrano, chief executive officer, right? Hanging back in the shadows, making sure his rules are in place but hanging back. Having good COOs, chief operating officers, doing the day-to-day stuff. Doing the day-to-day enforcement.

so that he could have in this case -- because this is a criminal organization -- deniability. A separation, as delicate as it was.

And ultimately that was Vince Garcia, running 26th Street for him, and then moving up even higher.

And when you think about that, what we have here is we have got the leaders right here, the CEO, his loyal and trusted day-to-day guy, and then Mr. Guzman right here for a period of time, middle management, right? Regional Enforcer in the Nation. His job, making sure the trains run on time, making sure there is discipline, making sure the neighborhoods are working, are operating, that internally everything is working out.

That's what these recordings revealed. That's what this testimony revealed.

And then you have the young up and comer, Mr. Chavez. Who we really only met and know about for about a month. Leading a neighborhood, trying to impress his bosses, perhaps some day being the next Vince Garcia who is running the whole Region or higher. These guys are an organization.

But the problem is it was all about crime.

And so as we get back to Mr. Zambrano and the trust, it's revealing what he said about his right-hand men, Fernando King and then Vince Garcia, and it's revealing what they said about him.

He is talking to Milt Shanna on this recording. The

thing is if we were doing something -- now I'm trusting you. I'm trusting you. I can depend on you not to bring me down, right?

He keeps very few people very close. And he is acknowledging that.

And then this, which is again tying him directly with Fernando King, when they took Piesa I didn't know who to trust because that was his guy for years and years and years. That was his guy. That was the guy who could go out front, be up front, being aggressive, laying down the law. And he didn't know who to trust.

And all he had was Possum, Vince Garcia; and talking about Milt Shanna. Very few people that he can hold close.

And what did they say about him? Fernando King: I'll sit down with the Viejo. This is a recording in October of '06 when Jesse Guajardo is talking about this insurance and saying well, we could sit down, you guys can come to my house. And Fernando King says no, no, no, no. I'll sit down with the Viejo and I'll get back to you.

Keeping that line, maybe a little bit of that deniability open.

The Viejo said, the Viejo said like this, it was Viejo's decision. It was Augustin Zambrano's decision.

And finally, on November 21st, when Fernando King is accepting this offer of insurance that they will provide insurance, the Viejo is going to be right with it. Anything I'm

going to agree to, the Viejo is going to be right with it.

What's that saying? That what Fernando King is saying in public, that man is agreeing to in private.

And then Vince Garcia, do you remember this phone call? November 4th of 2007.

And again, let's talk about interpretation. Yeah. When Vince Garcia says anyone wants to holler they can come holler at me. They want to holler at him, okay. The interpretation of the him there is Augustin Zambrano. Ultimately your call about what that means.

But the conclusion is inescapable, that Vince Garcia is talking about being the front man, being the mouthpiece, being the trusted man who is out front for his boss Augustin Zambrano.

There is trust, but there is still always some mistrust, right? He has been down this road before. I don't trust nobody, you know what I'm saying?

And Mr. Graham pointed out a couple of sequences where Mr. Zambrano is suggesting jeez, I didn't know. Right? I don't know. Boy.

And what he is doing in those statements is trying to put a wall up, right? If anything ever goes south for him. Hey, I didn't -- if he is collecting anything, let us know, right?

But we know in talking about the Miqueros on January 31st of 2008, we know that those Miqueros were paying. We know it from what Fernando King had said back in '06. We know it from

what Doughboy, Felipe Zamora, said not three days later.

Boy, if he is collecting, I don't know. You know, let us know. That would be good information to have, right? He is trying to keep a wall up.

And then April 14th of 2008, a statement that fortunately you all didn't fall out of your chairs when you heard it.

I didn't think they were going to break his hands. I thought they were going to beat his ass. Right?

Come on. Come on. That was his order. That was his order. A month earlier, if raindrop falls from the sky, right? And then jeez, I didn't know. I didn't know.

And then May 16th, a fascinating telephone call between Milt Shanna and Augustin Zambrano, right?

So let's paint the scene. Because at this point the Latin Kings know that Milt Shanna -- or they at least suspect strongly -- that Milt Shanna is cooperating, right?

And so Augustin Zambrano gets on the phone, talks to Milt Shanna, and tries to draw him out. He says come on down, you know, I can't talk about it on the phone, come on down.

And he says just enough, doesn't he? He says just enough. Yeah, he knew what was going on. I mean, I didn't think it was like that.

And right before that is Milt Shanna talking about how if they had sent someone other than one of his best friends that

he was going to be smoked. Do you remember that?

And his response, yeah, I mean, I didn't think it was like that. I thought they just trying and -- they gonna whup your ass.

Why would Milt Shanna, why would he be getting beaten up? Four months before he had taken a bullet for these guys, right? Why would he, at that time the Supreme Regional Enforcer of these guys, why would he be getting violated? Why would he be getting beaten up?

Trying to create separation. And Zambrano talked about it some more, his understanding.

November 5th, 2007, he is talking about -- they are talking about the roundup that had happened in December of '06. This guy Loks had been arrested. And Zambrano recounts how he had talked to Loks's lawyer, and they said well, they ain't got you on tape. They ain't got no evidence on you. That's why you ain't got locked up.

He knows how the game is played. He knew about the RICO Act. He is talking about it on tape. Keep some separation. Don't trust anybody.

It's a tough way to live, but that's how he lived. He was their Corona. He was their leader.

And you know, ladies and gentlemen, the last bit on this is remember those questions Mr. Graham had of Mr. Caquias about this hand-smashing on April 14th, 2008? And you guys heard the

whole tape.

And the first part of it Ruben Caquias is there, right? He is talking about what he had done, and what he was involved with.

And then the second part of the tape primarily is Mr. Shanna talking to Mr. Zambrano, Maria, and Vince Garcia, right? And what was the question to Ruben Caquias from Mr. Graham?

Well, Mr. Zambrano on that tape, he wasn't even there, was he, right? Do you remember that question? And Ruben Caquias said no, he wasn't.

And, ladies and gentlemen, would you have expected him to be? The guy sends two other people out to rob a bank. Is he going to go there himself? Or is he going to meet up later to see how it worked out?

The only guy who is going to go to the bank himself to check on the progress is a guy who is just not very smart. And one thing about Mr. Zambrano, he is a smart guy. He is a smart guy.

He is going to lay in the shadows, come in after the deed is done, talk about it, talk about how impressed he is.

Mr. Graham also said they didn't listen, right? The Latin Kings, they didn't listen to Mr. Zambrano. He wasn't -- he was just this old fogey, you know, 20 years older than everyone. They didn't listen to him.

Were his actions the actions of a notorious street gang

leader? Do you remember that argument yesterday?

We got the message you sent to us, Jesse Guajardo. Was Jesse Guajardo listening at that time in 2004 when Jesse Guajardo was a trusted member of the Latin Kings? Yeah, he was listening. And he did security for that man numerous times.

I'm out front, Old Man. Do you remember this conversation which proves Mr. Zambrano's involvement in the Latin Kings. Mr. Guajardo had some business to discuss with him. He had some Latin Kings' business to discuss with him. He called him up, said can I meet with you, and then they meet later on.

And what that was about was seeking Mr. Zambrano's assent, seeking Mr. Zambrano to make certain orders about whether a man could transfer from one section to another. And those orders were followed. On that occasion they listened to that man.

Remember this one? He is talking to Mr. Montoya. They are talking about meeting later on. But he says Frankie's. I got to go to Frankie's. Put somebody in check real quick.

Do you think that man who was being put in check real quick listened that night? You be the judge.

Then there is a conversation two days later with his nephew, Danny Montoya, Jr., a member of the Midway Latin Kings, officer of the Midway Latin Kings. He is not supposed to do none of that, you know. There is not going to be a violation. Because they are listening to Mr. Zambrano, the Corona.

Rudy Rangel, security. Rudy Rangel, Senior, do you remember those calls? Rudy Rangel, Senior. Hey, I'm at the bar, no one is here. There is no security here.

And again, think about that for a second. An elder respected Latin King is in a bar enjoying a drink, and they have security for him, security to protect them. That's what this is about. Violence at every turn.

He says I'm gonna call Little Danny, send somebody over there.

Giving out orders, taking action. There is a conversation with Mr. Montoya about this man named Mack. Do you remember that? It's a long time ago now. Three weeks ago. Jesse Guajardo talked to you about that.

Mack is a Latin Count who wants to open a section in the neighborhood controlled by the Latin Kings.

And at least as to Mr. Zambrano's accounting, they are on friendly terms with that gang in that area. But he says no. Zambrano's orders are no. No, we don't want them in there, chase us out of the neighborhood. And Montoya calls again, and he says Mack just called me, he still wants to talk to you.

But he is the one making that order. He is the one making that decision on behalf of that gang.

Rascal, he is like Zambrano, leave that guy on hold for a long time. Did the Latin Kings listen to Mr. Zambrano on that occasion? Did they follow his orders? Did they take action?

You know they did. You know they did. Rascal ultimately gets violated.

And then back to this north side Latin Kings meeting. I kept sweating you guys. I needed somebody to put order out here. He appointed someone to be in charge of the north side. Did they listen to him? Did he take action?

North side show of force, November 11th, 2007. As many as 300 Latin Kings from the south side come to the north side. On his orders. Called out by this man, Vince Garcia, his right-hand man, on his orders. Did anyone listen to him that -- day? Did he take action?

Garcia -- and you know he's the one who brought it to me. Talking about Garcia. Garcia talking about Zambrano. Talking about an order in terms of promotion that Zambrano made.

And the Midway section, after they -- after Milt Shanna and Zambrano talk about the Miqueros on January 31st, they go to this other conversation if you recall, and they talk about how the Midways were being moved. From Crown Town to the southwest region.

Whose order was that? Augustin Zambrano's, the Corona. Did he take action? Did they listen?

And then the orders over and over and over again that Jesse Guajardo followed to violate different people. Midway Latin Kings. The guy who comes into the bar false-flagging.

March 13th of 2008, right? Did they listen on that day?

Was that order sent out to Mr. Salazar? You know it was.

Because a month later on April 14th Salazar and Loks get violated. Did they listen to Mr. Zambrano? Did they follow his orders? Of course they did.

Mr. Zambrano, we did it to the Lenzis. You know what he did. He put them on hold, kill on sight for Jesse Guajardo because he was cooperating. The Lenzis, the whole chapter gets wiped out because their Inca was cooperating.

Did the Latin Kings listen? Did they follow his orders?

What he is about, what he led was a culture of intimidation, a culture of violence, dictated by rules, dictated by a Constitution.

Ladies and gentlemen, one last thing about Mr. Zambrano, right? You heard the -- this argument that well, that Constitution was dated 1986. It's old. It doesn't even apply anymore, right?

This one is over 200 years old, ladies and gentlemen, and it still applies. Gets updated now and again, but the Constitution of the United States, it still applies.

So this suggestion that that literature doesn't even apply anymore, the Corona, and this is all just words on a page. It is action, it is people following orders day after day, listening to him, following him, following the Constitution, the rules that he is in charge of.

Vicente Garcia, just a little bit on him because there

was much that his counsel said that I agree with. Those guns that we had out yesterday are scary. And I agree. I agree. And those guns are his. Those guns are Vicente Garcia's.

Now he also said, he said handle it. Vicente Garcia said handle it. He was doing his job.

I agree with that too. That was in reference to this shooting in March of 2006. Do you remember the sequence? They go to 26th Street, the Cicero Latin Kings do, because of this issue that Chongo had. And that man, Vicente Garcia, orders them to do a shooting.

Chongo doesn't do it and he is violated, and Nedal Issa is violated. And you know Nedal Issa was violated. He told you about it. And we have the hospital records of it.

The internal violence of the gang enforcing their own rules so that when they give an order it will be followed. Issa gets violated and the order from Vicente Garcia persists.

He said handle it. You bet he did. He was doing his job. You bet he was. His job at that point was Regional Enforcer, enforcing the rules of the Nation.

And that, ladies and gentlemen, is sufficient on Count 3 to have him facilitate the use of that weapon.

A defendant can facilitate the use or carrying of a firearm in a number of ways, including encouraging others to use a gun in the commission of the underlying crime.

He said do a burn. And the Latin Kings knew what that

meant and you now know what that meant. It means use a gun.

He facilitated that crime by just doing his job.

In terms of the extortion, his lawyer said there is no mention of Vince Garcia at all. Doughboy doesn't talk about him.

Ladies and gentlemen, look at the recordings. January 31st, 2008, Milt Shanna meets with Augustin Zambrano and they talk about it at the used car lot.

Three days later, February 2nd of 2008, he meets with Doughboy and Doughboy doesn't just talk about Vince Garcia once, it's on and on and on.

This is what he said. Doughboy didn't say anything about Vince.

Exhibit 197 is the transcript. Pull it out if you want back in the jury room. He says I got my word from Tino and from D Black. D Black, Vicente Garcia.

Zamora: I want to talk to Black. Zamora: I really want to talk to Black. And it goes on.

Cooperator: I got to go pick up Black in Bolingbrook.

Zamora: I'll come around just so I can talk to him.

Zamora: Yeah, man, tell Black to meet me. So I want to tell Tino and DK real quick.

There is seven different references by Felipe Zamora about Vicente Garcia, and that whole conversation, that entire conversation on February 2nd of 2008 is about the Miqueros. He is all over it.

Of course he is. Because in February of 2008 he is the Regional Inca of 26th Street where the Miqueros tried and where they are extorted. He is in on the decision-making and Zamora confirms it.

So let's talk about Jose Guzman. The tattoos, right?

Now, you remember the questions to one of the witnesses about the lion tattoo? Well, if you have a lion tattoo and, you know, you're in Detroit, that doesn't mean you are a Latin King, does it? It could be a Detroit Lion, right? I suppose that's true.

But you know what that was? That was more Hey Batta Batta. Because it has nothing to do with this case. He wasn't from Detroit, he was from Chicago, with that tattoo on his leg, the lion. It was the lion tribe, you heard abundant testimony about that.

But you know, the larger issue about tattoos is itself, one of these Hey Batta Batta moments, right? Because Alfonso Chavez doesn't have any tattoos and he is a Latin King. There can't be doubt about that. When he is asked, are you the new Inca? Yeah, I am. King Love, brother. All that. They shake, they do all that. Chavez doesn't have any tattoos. He is a Latin King.

Jose Guzman has that lion. What does it mean? Does it mean he is a fan of the movie. He is a naturist? Maybe. Or maybe it means that's evidence of his gang membership.

But none of it matters. Because the real question that you need to answer is was he a member of this enterprise? And for years and years and years you know that he was.

He reminded -- the defendant's lawyer argued to you this morning, he reminded five sections to carry out a standing order. Not a predicate act.

That's just false. When you say go out and do a shooting, it's shoot to kill. You are agreeing not once, not twice, five different predicate acts. Because attempted murder is a predicate act. And when you send someone out, it doesn't even matter, as the instructions will tell you, as the law will tell you, it doesn't even matter if anyone goes out.

Because when you make the call, in your head you're agreeing that another member is going to commit a predicate act.

So on September 23rd of 2007, in between the chili he was eating, he makes that phone call. That itself is sufficient to find him guilty of Count 1. Because in that phone call he agrees that not one, not two, but five members of the enterprise are going to commit a predicate act.

Shooting is not a predicate act. Again, Hey Batta Batta. That is just false.

A shooting, as you heard from that witness stand, is shoot to kill. That means attempted murder in this courtroom and in every courtroom in the United States.

Involved in one round of drug distribution, only one

predicate act. That's false. He can say it but it's false. Because as you know, and as those transcripts and recordings reveal, one round of distribution was 24 different distributions. 24 different predicate acts wrapped up into one round of these distributions. Because there were 24 Incas, there were 24 sections, 24 different groups got them.

So his acknowledgment -- and the evidence is clear that he was involved in that first distribution -- that alone is also sufficient to find him guilty of Count 1.

He is a member of the Latin Kings. You know that from the recordings and you know that from the words that he said to Agent Weismantel over two dates: first at the FBI, and then at the U.S. Attorney's Office.

So ultimately if you're going to dismiss what he said to Agent Weismantel, you're going to have to conclude that Agent Weismantel was lying to you, and that Jose Guzman didn't say any of the things that he told you about on the stand.

You can judge his credibility, Agent Weismantel's. Doing his job. Telling you straight up how it happened.

Jose Guzman, ladies and gentlemen, is guilty. He is guilty of Count 6, which is the drug conspiracy. He as much as acknowledged that through his lawyer.

And he is also, after you had find him guilty in terms of the special verdict form, it's over 500 grams, and here is why:

The first distribution unquestionably was his. That's, according to the chemist, we had that one distribution that was taken, given to the FBI, 166.5 grams. Okay. So that's one.

But he knew about all the rest. He conspired about all the rest. And he helped out too. He picked up collections one time, November, I believe, 16th of 2007. He paid Milt Shanna. He was gathering some collections for him. He provided him advice about how to collect. He knew about it.

He didn't withdraw from that conspiracy. He knew about it, he participated in it, he supported it. So he is guilty of Count 6 and he is guilty of Count 1 for all the reasons that we talked about.

Finally ladies and gentlemen, Alfonso Chavez.

And you heard from his lawyer that -- well, I'm not even sure about it, was it the argument that he wasn't the Inca? Because if he wasn't the Inca, he sure did a lot of Inca-like stuff over a month's of time, right? He collected cocaine three different times. He paid for cocaine three different times.

He and his guys went to the north side as a show of force on November 11th, 2007. Let's talk about that for a second, right?

Milt Shanna, this what, this master liar? Milt Shanna said no, I don't remember seeing Chavez that day. But that doesn't mean that he wasn't there.

With 300 guys going up there, the fact that he doesn't

recall seeing Alfonso Chavez that day, that means he was telling it to you straight.

But you know that Chavez was there because the very next day when he is involved in this drug distribution and he is on tape, he is thanked for showing up, and they talked about it, he and his boys showing up.

It's on tape, ladies and gentlemen. It's on tape.

The mandatory bust-outs that his man were involved with. Hey, I saw what you guys did last week, you had 20 guys out. That's a mandatory bust-out.

He reports the shooting. And why does he? Because he is seeking relief. It's gonna be hot. Five-0 is going to be out. I don't want my guys to be jeopardized.

He is doing what a good Inca does. He is reporting to the Nation and he is looking for a little relief.

So then the argument is about the drugs. And one of the arguments that Mr. Vargas made was well, the quality of the video it's not that good. You see for yourself what actually did happen.

So what does that mean? I mean, really what that means is what? That Mr. Chavez didn't get the dope? But he doesn't ultimately come out and say that. He just says you look at the video.

You should look at the video. You can see. Quarter-ounces of cocaine, much less than 150 kilos. Well,

that's clearly a true statement of fact. But again, what does that mean? Should we just give the man a pass because he was involved in a quarter-ounce distribution used to generate money for the box? Should you just give him a pass for that?

And then finally, well, it could be for personal use. It could be, but there was no testimony about that, right?

So which is it, you know? I mean, I guess for you the thought is well, you just choose any of those doors, right, A, B, or C, and my guy walks on the drugs. But he doesn't even point you to one direction, and he can't, because the evidence is that three different times he picks up dope, and three different times he comes back and pays for it after its sold.

The Camargo shooting, right? He says well, did he even -- did he even hear a shot?

Again, what is that supposed to mean? That the shooting didn't happen. You have got the hospital records from Mr. Camargo, right? And you have got Mr. Chavez's own statements that our guys were on their stuff. And then he says Chavez said the guy was speeding away, driving the wrong way.

In fact, what he said, what Alfonso Chavez said that day, was some dude went speeding down the block and well, you know how that goes.

And in fact, what the witness testified to was that guys came up. He wasn't looking. He wasn't looking. He was driving. He sees guys come up. He doesn't know whether gang signs were

flashed. He doesn't know.

But when bricks or some objects hit his car, I tried to leave quickly away.

That's what he testified to.

So his, leaving quickly away. Mr. Chavez's, he went speeding down the block. It's all the same. But what it means is that there was a violation of rule 23.

But again, even if there wasn't, it's more Hey Batta Batta.

Because what we know is that on that day, November 25th, a Sunday night, a time of mandatory bust-out for the Almighty Latin King Nation, his boys were on their stuff, and his boys did a shooting. His boys. His soldiers. And he was dutifully reporting that to the Nation so that they could get some consideration.

We didn't say that Alfonso Chavez shot the gun. We didn't say Alfonso Chavez provided the gun because we don't have to. That's not the allegation.

The allegation is that he was an Inca of the Latin Kings involved in that enterprise, and wanting to be a good Inca and making sure that his soldiers were involved, his soldiers were out on the block protecting their turf, and that's what he did.

You know it from the tapes, you know it from the literature, you know that what he was doing in that month's period of time was trying to make a name for himself, trying to

be a good Inca. And what that caused when his men were on their stuff was an innocent man was shot.

Finally, ladies and gentlemen, a word about the cooperators, who, you know, we can have some semantics about who chose them, but here is what we know. Here is what he know.

Things they testified about, things they told you about, they were corroborated. Back and forth, up and down, through recordings, through gang literature, through the other evidence that you saw in this case.

And so all of the arguments about this deal or that deal, it's more Hey Batta Batta. It's more trying to divert your focus from the evidence and the truth.

They stepped up. Many of them got paid. Let's talk about some of that.

Milt Shanna gets $50,000. You heard why he got paid, at least in part. Because he had to quit his job because he was working full-time undercover from May of '07 to May of '08 making hundreds of tapes as part of this investigation.

And now he gets relocated, right, and that's a benefit to him. You ask yourself, is that a benefit? This text that the defense tried to get great mileage out of, this text where he talks about his frustration.

His frustration because he hasn't yet changed his name. His frustration because he can't work. The man has a new identity, ladies and gentlemen. He has a kill on sight by a gang

that you heard testimony about has 10,000 members. 10,000 members.

Was he telling the truth? That's for you to decide when you think with great caution and care about his testimony. But when you do, and when you think about the circumstances and the things that he went through, being undercover for a year, and now looking over his shoulder maybe for the rest of his life, think about that too.

Jesse Guajardo, works undercover from February 28th of 2006 until December 4th of 2006, every day making recordings. Also --

MR. GRAHAM: Objection, Judge. That's not the evidence.

THE COURT: All right. Members of the jury, closing arguments are not evidence.

If your recollection of the facts are different from what the attorneys argue you are to rely on your recollections and your determination of what the facts are.

MR. PORTER: Making lots of recordings, ladies and gentlemen. Lots of recordings.

And now with a kill on sight on him having to look over his soldier for the rest of his life.

Judge them, absolutely. Judge their testimony.

And when you consider everything that you heard in this case, is it corroborated? Because what that argument tried to do is to deflect your focus away from those two tables right there.

But what they told you, what they represented to you, was a culture that got to them when they were boys. Nedal Issa, when he was 13 years old, joins this gang and then is asked to do violence, to go to a middle school to protect someone else.

Jesse Guajardo, there was some cross examination about how he helped his father, remember, at the age of eight to distribute drugs. At the age of eight.

Milt Shanna who became a Latin King when he was 14. And the stories persist.

So when Mr. Grimaldo was examined, and then discussed that when he was shooting at that guy he was trying to kill him, remember? Yeah, he was. That's what this case is about. Sending boys to war not six miles from the seats that you sit in right now.

Ladies and gentlemen, this is serious business. When we met four and a half weeks ago you likely had no idea what was going on six miles from this court house. But you know, you now have an opportunity to do something about it.

There is this Native American saying about how we're all supposed to leave this land just a little bit better than how we found it. And after this trial you are going to get to go back to your refereeing, graphic design, maybe you will make that dress, your nursing, your jewelry, your grandkids, your families, your jazz.

But now, now is the time for you to do justice. To find